**UNITED STATES of America,**

v.

**John D'AMICO, a/k/a "Jackie the Nose," and Joseph Watts, a/k/a "Joseph Russo," a/k/a "Joseph Pietruszka," Defendants.**

**No. 09 Cr. 62(CM).**

United States District Court,
S.D. New York.

Aug. 10, 2010.

Arlo Devlin–Brown, Chi T. Steve Kwok, U.S. Attorney's Office, New York, NY, for Plaintiff.

Elizabeth Edwards Macedonio, Elizabeth E. Macedonio, P.C., Bayside, NY, Gerald Lawrence Shargel, Law Offices of Gerald L. Shargel, Joel Winograd, Winograd & Winograd P.C., New York, NY, for Defendants.

## DECISION AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS

McMAHON, District Judge.

### *INTRODUCTION*

Defendant Joseph Watts ("Watts"), an alleged associate in the "Gambino Orga-

nized Crime Family" (or "Gambino Family"), is charged in the Superseding Indictment (S1 09 Cr. 62 (the "Indictment")) with: (1) conspiring to participate in the conduct of the affairs of a criminal enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d) (Count One); and (2) killing and aiding and abetting others in killing Frederick Weiss ("Weiss"), a potential witness in a then-pending trial in this District, in violation of 18 U.S.C. § 1512(a) (Count Three).[1]

Watts has filed two sets of pretrial motions asking the Court to (1) dismiss Count One of the Indictment as unconstitutionally vague or, "[a]t a minimum," order the Government to provide a bill of particulars (Mem. in Supp. of Watts' Second Set of Pretrial Mots., Oct. 23, 2009 ("Watts' Second Mem."), at 6); (2) dismiss Count Three—the Weiss murder count (which was Count Two in the original indictment)—as time-barred; (3) dismiss Count Three as barred by double jeopardy and/or res judicata; (4) dismiss Count Three as barred by a plea agreement that Watts entered into in 1996 with the U.S. Attorney's Office ("USAO") for the Eastern District of New York ("EDNY"); (5) dismiss Count Three because the Government is estopped from claiming that Watts murdered Weiss or aided and abetted the murder because that claim is factually inconsistent with the position taken by the Government in prior prosecutions of other organized crime associates; and (6) suppress the fruits of the search of the Manhattan office of a company called American Blast, Ltd. ("American Blast").

For the reasons set forth below, Watts' motions are denied.

## BACKGROUND

### I. The Indictment

The Government alleges that Watts was part of the Gambino Organized Crime Family from about 1980 through March 2009. (Superseding Indictment ¶ 13.) The Gambino Family allegedly constituted a RICO "enterprise," 18 U.S.C. § 1961(4), whose members and associates engaged in numerous violent and other crimes, including murder, obstruction of justice, extortion, "loansharking," money laundering and illegal gambling. (Superseding Indictment ¶¶ 1–2.) The Indictment alleges that the Gambino Family, which was based in New York City, was part of a nationwide criminal organization known as the "Mafia" or "La Cosa Nostra" ("LCN"). (Id. ¶¶ 2–3.) Five other organized crime families allegedly operated in the New York City area, including the "DeCavalcante Organized Crime Family" (or "DeCavalcante Family"). (Id. ¶ 3.)

The Indictment alleges that the Gambino Family operated through groups of individuals known as "crews" and "regimes," each of which had as its leader a man known as a "Caporegime," "Capo" or "Captain." (Id. ¶ 4.) The crews allegedly consisted of " 'made' members," sometimes called "Soldiers," who were aided in their criminal endeavors by other trusted individuals, known as "associates" (an associate, such as Watts, could not become a "made" member because his father was not Italian). (See id.) Above the Capos was the "Administration"—the highest-ranking members of the Gambino Family, including its head, the "Boss." (Id. ¶ 6.)

### A. Count One: RICO Conspiracy

Count One of the Indictment charges Watts with conspiring—from 1980 into

---

1. The Superseding Indictment also named John D'Amico ("D'Amico") as a defendant.

D'Amico pleaded guilty to a Superseding Information on August 5, 2010.

2009—"to conduct and participate, directly and indirectly, in the conduct of the affairs of [the Gambino Family] enterprise through a pattern of racketeering," in violation of 18 U.S.C. § 1962(d). (Superseding Indictment ¶ 13.) The Indictment specifies Watts' alleged position in the Gambino Family: Watts was an associate, but a "close associate" of Boss John A. Gotti, and "was afforded the status of a Gambino Family Capo." (*Id.* ¶ 10.)

Count One alleges that in order to protect and expand the Gambino Family's business, members of the Family and their co-conspirators murdered and attempted to murder persons who engaged in activities that threatened the Family's power and criminal operations. (*Id.* ¶ 12(a).) The Government alleges that "Frederick Weiss was killed by . . . WATTS and [his] co-conspirators because Weiss was believed to be cooperating with law enforcement." (*Id.* 12(c).) According to the Government, Watts "plotted the murder." (*Id.*)

Count One further alleges that Watts and his co-conspirators generated income for the Gambino Family through loansharking, gambling, extortion and fraud. (*Id.* ¶ 12(d).) In particular, the Government alleges that Watts and others extorted "protect[ion]" payments from individuals and businesses seeking to "avoid harm from" the Gambino Family; that Watts ran a loansharking operation centered in Staten Island; and that Watts defrauded business partners by misrepresenting himself as "Joseph Russo." (*Id.*)

Members and associates of the Gambino Family allegedly "laundered" the proceeds of their criminal activities through various means. (*Id.* ¶ 12(e).) Watts, for example, allegedly used such criminal proceeds to purchase and renovate properties and other assets in Florida through straw buyers. (*Id.*) Watts and others also allegedly created an energy drink company called American Blast in 2007, which was used to launder Gambino Family proceeds. (*Id.*)[2]

Count One further alleges that members and associates of the Gambino Family misrepresented the nature of their income and financial transactions to obstruct judicial proceedings brought against them. (*Id.* ¶ 12(h).) Watts allegedly paid a witness $625,000 to create a false defense to criminal charges pending against Watts. (*Id.*)

In the section of Count One titled "The Pattern of Racketeering," paragraph 15 of the Indictment alleges that the pattern of racketeering through which Watts and his co-conspirators agreed to participate in the conduct of the affairs of the enterprise consisted of:

multiple acts and threats involving:

(a) Murder, in violation of New York Penal Law, Sections 125.25, 105.15, and 110.00;

(b) Gambling, in violation of New York State Penal Law, Sections 225.00 and 225.10; and

(c) Commercial bribery, in violation of New York Penal Law § [sic]180.03[;]

and multiple acts indictable under:

(d) Title 18, United States Code, Section 1951, involving extortion;

(e) [18 U.S.C. § 892], involving the making of extortionate extensions of credit;

(f) [18 U.S.C. § 1512], involving obstruction of justice, and witness tampering;

(g) [18 U.S.C. § 1955], involving the operation of an illegal gambling business;

---

**2.** The facts relevant to Watts' motion to suppress the fruits of the search of American Blast's office will be set forth in the discussion of that motion, *infra* at Discussion VI.

(h) [18 U.S.C. § 1952], involving the use of interstate facilities to commit commercial bribery;

(i) [18 U.S.C. §§ 1956 and 1957], involving money laundering; and

(j) [18 U.S.C. §§ 1341 and 1343], involving mail fraud and wire fraud.

(Superseding Indictment ¶ 15.)

### B. Count Three: Murder of a Witness

Count Three of the Superseding Indictment charges Watts under 18 U.S.C. § 1512 with the 1989 murder of Frederick Weiss, a potential witness in the then-pending trial of *United States v. Angelo Paccione, et al.*, 89 Cr. 446(CBM). (Superseding Indictment ¶ 21.) The Government alleges that:

> From in or about September 1, 1989 to in or about September 11, 1989, in the Southern District of New York, the Eastern District of New York, and elsewhere, ... JOSEPH WATTS, ... with malice aforethought, willfully, deliberately, maliciously and with premeditation killed and aided and abetted others in killing, Frederick Weiss with intent to (a) prevent the attendance and testimony of Frederic [sic] Weiss in an official proceeding, and (b) prevent the communication by Frederick Weiss to a law enforcement officer or Judge of the United States information relating to the commission and possible commission of a Federal offense ....

(*Id.*)

### II. The Prior Prosecution of Watts in the EDNY

In the mid–1990s, Joseph Watts was prosecuted in the EDNY for, inter alia, conspiring to murder Frederick Weiss. Watts argues that the EDNY prosecution, which ended in a mid-trial plea agreement, bars the Weiss murder count in the current Indictment.

In 1993, the EDNY USAO charged Watts with nine counts of racketeering-related offenses. *See United States v. Joseph Watts*, 93 Cr. 294(S–2)(CPS) (the "EDNY Indictment"). One of the counts in the EDNY Indictment charged Watts under 18 U.S.C. § 1959 with conspiring to murder Weiss in aid of racketeering. The EDNY Indictment read, in relevant part, that:

> In or about and between August 1989 and September 11, 1989, within the Eastern District of New York and elsewhere, the defendant JOSEPH WATTS, together with James Failla, Dominick Borghese, John Gotti, Salvatore Gravano and others, for the purpose of gaining entrance to and maintaining and increasing position in the Gambino Family, an enterprise engaged in racketeering activity, conspired to murder Fred E. Weiss ....

In addition, the EDNY Indictment charged Watts with a substantive RICO violation under 18 U.S.C. § 1962(c). The third of the five predicate acts alleged in the RICO count was conspiracy to murder Weiss in violation of state law.

In 1996, after his trial had begun, Watts pleaded guilty to one count (conspiracy to murder Thomas Spinelli) of the nine-count EDNY Indictment. *See* Plea Agreement, *United States v. Watts*, 93 Cr. 294(CPS), Feb. 15, 1996 (the "Plea Agreement" or "Agreement"), attached as Ex. A to the Aff'n of Gerald L. Shargel, dated Apr. 29, 2009 ("Shargel Aff'n"). Pursuant to the terms of the Agreement, Watts received a six-year prison sentence and the remaining eight counts were dismissed. *See id.* ¶¶ 2, 4(a); (*see also* Shargel Aff'n Ex. B (Tr. of Watts Sentencing, June 11, 1996)).

The Plea Agreement provided, inter alia, that the EDNY USAO would bring no

further charges against Watts for the conduct described in the EDNY Indictment. Plea Agreement ¶ 4(b). Significantly, the Agreement's reach was expressly limited to the EDNY USAO: the Agreement stated that, "This Agreement is limited to the United States Attorney's Office for the Eastern District of New York and cannot bind other federal, state, or local prosecuting authorities." *Id.* ¶ 7. Additional terms of the Agreement will be discussed herein, as they become relevant.

## DISCUSSION

### I. Watts' Motion to Dismiss Count One as Unconstitutionally Vague

Watts moves to dismiss Count One on the ground that it is unconstitutionally vague or, in the alternative, for an order requiring the Government to provide a bill of particulars. For the reasons explained below, Count One meets the constitutional standard, and the Court declines to order a bill of particulars.

### A. Legal Standard for the Sufficiency of the Indictment

■ " 'An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events.' " *United States v. Yannotti,* 541 F.3d 112, 127 (2d Cir.2008) (*quoting United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir.1992)). As the Second Circuit has consistently held, " 'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.' " *Id.* (*quoting United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir.1998)). "Federal Rule of Criminal Procedure 7(c) requires only that an indictment be 'a plain, concise, and definite

written statement of the essential facts constituting the offense charged.' " *Id.* (*quoting* Fed.R.Crim.P. 7(c)).

■ In the RICO context, the Second Circuit has recently emphasized that " 'the agreement proscribed by section 1962(d) is [a] conspiracy to participate in a charged enterprise's affairs' through a pattern of racketeering, *not* [a] conspiracy to commit predicate acts.' " *United States v. Pizzonia,* 577 F.3d 455, 463 (2d Cir.2009) (*quoting United States v. Persico,* 832 F.2d 705, 713 (2d Cir.1987)) (emphasis added); *Yannotti,* 541 F.3d at 121 (same). "To establish a RICO conspiracy, the government must prove that a defendant agreed to participate in the affairs of the enterprise through a pattern of racketeering activity." *Yannotti,* 541 F.3d at 121.

■ In *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the Supreme Court made clear that to establish this pattern, the government need not prove that the defendant himself agreed that he would commit two or more predicate acts. *See id.* at 64, 118 S.Ct. 469. Instead, "to be found guilty of RICO conspiracy, a defendant need only know of, and agree to, the general criminal objective of a jointly under-taken scheme." *Yannotti,* 541 F.3d at 122 (*citing Salinas,* 522 U.S. at 63, 118 S.Ct. 469). As the Second Circuit stated in *United States v. Ciccone,* 312 F.3d 535 (2d Cir.2002), a defendant "need not commit or even agree to commit the predicate acts ... to be found guilty of the racketeering conspiracy, for it suffices that he adopted the goal of furthering or facilitating the criminal endeavor." *Id.* at 542 (internal quotations and citation omitted).

■ Thus, "to secure [defendant's] conviction for RICO conspiracy, the government [is] not required to prove the *actual* commission of a single predicate act by

[defendant] or any other conspirator." *Yannotti*, 541 F.3d at 129. Rather, "The predicate acts are relevant merely to establish the existence of the charged agreement among members of the conspiracy to conduct the affairs of the enterprise through a pattern of racketeering conduct and do not constitute separate criminal objectives." *Id.*

## B. Count One Is Not Impermissibly Vague

■ Count One of the Indictment passes constitutional muster. Count One may not be as specific as Watts would like, but it is considerably more specific than Watts' moving papers would have one believe. It includes the necessary elements, and as much detail as is constitutionally required—perhaps little more, but not less.

Count One tracks the applicable language of the RICO statute. It alleges that Watts and others "conspire[d] and agree[d] ... to conduct and participate, directly and indirectly, in the conduct of the affairs of [the Gambino Organized Crime Family]," an "enterprise [that] was engaged in, and the activities of which affected, interstate and foreign commerce, ... through a pattern of racketeering activity." (Superseding Indictment ¶ 13.)

■ Count One also states the approximate time and place of the alleged crime. It states that the alleged conspiracy occurred "[f]rom in or about 1980 through in or about March 2009, in the Southern District of New York and elsewhere." (*Id.*) While 1980 to 2009 is an unusually long time period to be charged in an indictment, that does not invalidate Count One. Watts complains that Count One does not provide the times and places of the alleged *predicate acts*, but the charged crime is the racketeering *conspiracy*—which, according to the Government, spanned approximately

thirty years. As the Second Circuit made clear in *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir.2009), "a racketeering *conspiracy* is a concept distinct from (a) the *pattern* of racketeering ... and (b) *the predicate acts* that may evidence the pattern." Although the underlying predicate acts may be—and often are—relevant "to establish the existence of the charged agreement," they "do not constitute separate criminal objectives." *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir.2008).

In addition to satisfying the basic requirements of tracking the language of the RICO statute and stating the approximate time and place of the alleged conspiracy, the twelve pages of Count One provide certain details regarding the nature and structure of the charged enterprise, its purposes, means and methods, and Watts' position in the Family. (*See* Superseding Indictment ¶¶ 1–15.) The Indictment also lists the state and federal statutory offenses that allegedly comprise the pattern of racketeering through which Watts and his co-conspirators agreed to participate in the enterprise's affairs. (*Id.* ¶ 15.)

Although that list of predicate offenses—set forth in the "Pattern of Racketeering" section of Count One—does not detail the conduct that allegedly violated each listed statute, Count One elsewhere describes several instances of criminal activity by Watts that allegedly occurred as part of the charged conspiracy. (*See id.* ¶ 12.) For example, Watts allegedly plotted the Weiss murder in 1989; ran a loansharking operation centered in Staten Island; laundered Gambino Family proceeds through an energy drink company that he created in 2007, and by purchasing properties in Florida through straw buyers; and paid a witness $625,000 to create a false defense in a pending criminal trial. (*Id.*)

Watts contends that these descriptions should not be viewed as amplifying the list of predicate offenses because they appear in the "Means and Methods of the Enterprise" section of Count One—not the "Pattern of Racketeering" section. (*See* Reply Mem. in Further Supp. of Watts' Second Set of Pretrial Mots., Jan. 13, 2010 ("Watts' Second Reply"), at 6.) The Court finds this argument unpersuasive. First, while the elements of "enterprise" and "pattern" are distinct, they often naturally overlap. *See Boyle v. United States*, —— U.S. ——, 129 S.Ct. 2237, 2245, 173 L.Ed.2d 1265 (2009); *Pizzonia*, 577 F.3d at 463. Second, the Indictment consistently and repeatedly introduces these allegations of Watts' criminal conduct with the phrase, "as part of the conspiracy" (Superseding Indictment ¶ 12), making clear that the specified acts are alleged to have occurred as part of the charged RICO conspiracy. Finally, Watts' conduct described in the enterprise section corresponds with statutory offenses listed in the pattern section (which include, for example, murder, extortion, money laundering and obstruction of justice). In short, the descriptions of criminal conduct in the enterprise section provide some additional "factual particularity," *see United States v. Walsh*, 194 F.3d 37, 45 (2d Cir.1999), and thus help ensure that Watts is afforded constitutionally sufficient notice of the RICO conspiracy charge lodged against him.

In arguing for Count One's dismissal, Watts claims that *Pizzonia. Yannotti* and other "post-*Salinas* decisions" require RICO conspiracy indictments to plead predicate acts of racketeering in greater detail than the Government has here. (*See* Watts' Second Mem. at 3–4.) They do not.[3]

Indeed, both *Pizzonia* and *Yannotti* distinguish between individual predicate *acts* of racketeering and the broader concept of a RICO *conspiracy*. And while the *Pizzonia* indictment did contain a standalone RICO conspiracy count that specifically alleged seven acts of racketeering, *see* S4 05 Cr. 425(JBW) (E.D.N.Y. Dec. 7, 2006)—not, contrary to the Government's mistaken assertion, a § 1962(d) count that merely "referred back" to predicate acts charged in a substantive § 1962(c) count (*see* Gov't Mem. in Opp. to Watts' Pre–Trial Mots., Dec. 21, 2009 ("Gov't Second Opp."), at 7)—that does not mean that *Pizzonia* should be read as requiring all RICO conspiracy counts to be pleaded in that form, or that the instant Indictment is necessarily insufficient.

Furthermore, the Government *is* correct that § 1962(d) counts often refer to specifically described predicate acts merely because they are charged alongside *substantive* RICO counts—in which predicate acts must be charged, and proved. In the *Yannotti* indictment, for example, the RICO conspiracy count described the alleged pattern of racketeering simply by incorporating by reference the predicate acts already set forth in the preceding § 1962(c) count, *see* S1 04 Cr. 690(SAS) (S.D.N.Y. June 6,

---

**3.** At one point in his moving papers, Watts states that he "attacks Count One ... for failing to specify any predicate acts to whose commission *he* allegedly agreed." (Watts' Second Reply at 2 (emphasis added).) To the extent Watts advances this argument—i.e., that Count One fails because it does not specify two predicate acts to which *he* agreed—it is, of course, foreclosed by *Salinas v. United States*, 522 U.S. 52, 64, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). *See supra* Discussion I.A. Watts' principal contention, however, and the one analyzed herein, is that Count One fails because it does not sufficiently particularize the predicate acts that allegedly comprise the pattern through which Watts and his coconspirators agreed to participate in the enterprise's affairs. (*See, e.g.,* Watts' Second Mem. at 1–2.)

2005); contrary to Watts' mistaken contention (*see* Watts' Second Reply at 3 n. 1), the § 1962(d) count did not specify any additional acts of racketeering, but rather alleged only the necessary agreement. In sum, the Court does not interpret *Pizzonia* or *Yannotti* as requiring more than what the Government has alleged in Count One here.

Watts also cites the Second Circuit's decision in *United States v. Pirro*, 212 F.3d 86 (2d Cir.2000), as well as the Supreme Court's decision in *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (upon which *Pirro* relies), for the proposition that Count One fails because it must—but does not—" 'descend to particulars,' describing discrete 'criminal act[s] rather than [ ] type[s] of crime,' so 'the prosecution will not fill in elements of its case' with facts never passed on by the grand jury." (Watts' Second Mem. at 5 (*quoting Pirro*, 212 F.3d at 92–93) (emphasis deleted).) But quoting favorable language from higher courts does not make it applicable to the case at bar.

In *Pirro*, the Second Circuit affirmed the dismissal of an indictment that failed to allege an element of the offense charged—namely, "a material falsehood or an omission that amounted to a material falsehood," 212 F.3d at 93. The indictment charged the defendant with not disclosing on his tax return an "ownership interest" in certain properties, but the Government failed to allege facts giving rise to a duty to disclose that interest. *Id.* Thus, more factual detail was needed just to plead the essential elements of the charged offense. There is no similar defect in the Indictment presently before the Court.

In *Russell*, the Supreme Court overturned the defendant's conviction stemming from his "refus[al] to answer some questions of a Senate subcommittee" because the indictment "did not even purport to inform him in any way of the identity of the topic under subcommittee inquiry." 369 U.S. at 767–68, 82 S.Ct. 1038. Thus, the indictment "fail[ed] to fulfill its primary office—to inform the defendant of the nature of the accusation against him." *Id.* at 767, 82 S.Ct. 1038. Watts makes a similar claim here—that Count One is so vague that he will "have to wait until trial to learn 'the gist of the charge[ ]' against him." (Watts' Second Mem. at 6 (*quoting Pirro*, 212 F.3d at 93).) That is plainly not the case. The instant Indictment *does* fulfill its "primary office" of informing Watts of the nature of the RICO conspiracy charge against him.

Watts also points to several district court cases, none of which actually involved the dismissal of a RICO conspiracy count. (*See id.* at 5–6 (*citing United States v. Galestro*, No. 06 Cr. 285, 2008 WL 2783360 (E.D.N.Y. July 15, 2008); *United States v. Urso*, 369 F.Supp.2d 254 (E.D.N.Y.2005); *United States v. Solovey*, No. 04–CR–2445, 2005 WL 1279228 (W.D.N.Y. May 31, 2005); *United States v. Gotti*, No. S4 02 CR 743, 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004); *United States v. Abrams*, 539 F.Supp. 378 (S.D.N.Y.1982)).) Watts relies most heavily on Judge Garaufis' decision in *Urso*, but the case is of no help to him.

In *Urso*, the court dismissed two *substantive* loansharking counts for lack of specificity. Each count consisted of a single, short paragraph that did *nothing* more than track the statutory language and state the approximate time and place of the crime. *See* 369 F.Supp.2d at 265. However, in that same decision, Judge Garaufis refused to dismiss a *predicate act* that alleged a loansharking *conspiracy* with the very same lack of detail. *Id.* at 267. The court noted that "it is well estab-

lished that an indictment for conspiracy to commit a criminal offense may be stated with less specificity than an indictment charging the commission of that substantive offense." *Id.* (*citing United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir.2002)).

Here, Count One charges a racketeering *conspiracy*, not a substantive violation; further, the two loansharking counts dismissed in *Urso* were far more sparsely pled than the twelve-page RICO conspiracy count at issue here, and both alleged direct violations of federal law, not predicate acts of racketeering. *Cf. Gotti*, 2004 WL 32858, at *7 (noting, as Watts concedes, that a crime alleged as a RICO predicate act need not be pleaded with the same specificity as the same crime charged as a direct violation of federal or state law). Thus, Watts' citation to *Urso* is inapposite and, if anything, undercuts his position.

For the reasons discussed above, the Court concludes that Count One is not unconstitutionally vague. Accordingly, Watts' motion to dismiss Count One is denied.

### C. Watts' Request for a Bill of Particulars

■ In the alternative, Watts seeks a bill of particulars from the Government providing the identities of alleged co-conspirators and witnesses, as well as certain dates, locations and other details of the predicate acts alleged in Count One. (Aff'n of Ross H. Kramer, Oct. 23, 2009 ("Kramer Aff'n"), Ex. A (Ltr. Request for Bill of Particulars, dated Oct. 14, 2009).) In light of the "Enterprise Letter" recently submitted by the Government (Docket No. 37), Watts' request for a bill of particulars is denied.

■ Federal Rule of Criminal Procedure 7(f) permits a district court to order a bill of particulars. Fed.R.Crim.P. 7(f). A bill of particulars "is appropriate to permit a defendant 'to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'" *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir.1988) (*quoting United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.1987) (per curiam)).

■ "A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. Gibson*, 175 F.Supp.2d 532, 537 (S.D.N.Y. 2001). "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." *United States v. Gotti*, No. S4 02 CR 743, 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004).

■ The decision to grant or deny a bill of particulars "rests within the sound discretion of the district court." *Bortnovsky*, 820 F.2d at 574. "Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Id.*

The Court declines to order a bill of particulars in this case. The Government's Enterprise Letter, which specifies a considerable number of supplementary facts concerning the predicate acts underlying the RICO count, provides Watts with much of the information sought in his request for a bill of particulars. The Court is satisfied that the Government has met its obligations, and that Watts has sufficient notice of the charges against him so that he can adequately prepare for trial.

## II. Watts' Motion to Dismiss Count Three as Time–Barred

Watts moves to dismiss the Weiss murder count on the ground that it is time-barred. In his initial brief, Watts argued that the Weiss murder count, as set forth in the original indictment, failed to allege the elements of first-degree murder, and therefore could not benefit from the unlimited statute of limitations for capital crimes, 18 U.S.C. § 3281. Watts' principal argument, however, is that even if the Weiss murder count does charge first-degree murder, it is untimely because the death penalty could not have constitutionally been imposed in 1989 when Weiss was killed—such that the crime is not "punishable by death" within the meaning of § 3281, and therefore not subject to that section's unlimited statute of limitations.

As explained below, the Superseding Indictment has rendered the first argument moot, and the second argument fails on the merits.

### A. Count Three of the Superseding Indictment Charges First–Degree Murder

The Weiss murder count charges Watts with murdering a witness in violation of 18 U.S.C. § 1512. Section 1512 punishes such murders as provided in 18 U.S.C. § 1111. 18 U.S.C. § 1512(a)(3)(A). Section 1111, in turn, authorizes a maximum sentence of death for first-degree murder, and life imprisonment for second-degree murder. 18 U.S.C. § 1111. In his initial brief, dated April 29, 2009, Watts argued that the Weiss murder count in the original indictment "fails to allege the elements of first-degree murder as defined in § 1111—specifically, that [Weiss's] killing was willful, deliberate, malicious, with premeditation and malice aforethought." (Mem. in Supp. of Watts' First Set of Pretrial Mots., Apr. 29, 2009 ("Watts' First

Mem."), at 3 (internal quotations and citation omitted).)

On June 1, 2009, the Government filed the Superseding Indictment. The Weiss murder count (Count Three) now alleges that Watts, "with malice aforethought, willfully, deliberately, maliciously and with premeditation killed and aided and abetted others in killing, Frederick Weiss." (Superseding Indictment ¶ 21.) The Government, of course, maintains that "the original indictment was plainly sufficient to allege murder in the first degree," but states that it added the above-quoted language "in an abundance of caution, and to obviate any need to address the issue." (Gov't Mem. in Opp. to Watts' First Set of Pretrial Mots., June 8, 2009 ("Gov't First Opp."), at 7 n. 4.)

The Court expresses no opinion on whether the original Weiss murder count alleged first-degree murder; Count Three of the Superseding Indictment plainly does, and Watts' argument is therefore moot.

### B. Count Three Is "Punishable by Death" Within the Meaning of § 3281

Watts' principal argument in support of his motion to dismiss the Weiss murder count as time-barred stems from the fact that, when Weiss was killed in 1989, the death penalty could not have constitutionally been applied to a § 1512 violation as a result of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Because the death penalty could not have been imposed when the crime was committed, the argument goes, the Weiss murder is not a crime "punishable by death," 18 U.S.C. § 3281, and therefore is not subject to § 3281's unlimited limitations period. The reasoning underlying Watts' argument is that the phrase "punishable by death" refers to whether, as a

practical matter, the death penalty could be imposed in a given case, and not to whether Congress—as a result of its judgment that a particular crime is especially serious in nature—has authorized the death penalty in the charging statute.

At the time Watts filed his motion, three circuits—the Fourth, Eighth and Ninth—had rejected this argument (or a close corollary of it). *See United States v. Ealy,* 363 F.3d 292 (4th Cir.2004), *cert. denied,* 543 U.S. 862, 125 S.Ct. 227, 160 L.Ed.2d 103 (2004); *United States v. Edwards,* 159 F.3d 1117 (8th Cir.1998), *cert. denied,* 528 U.S. 825, 120 S.Ct. 309, 145 L.Ed.2d 64 (1999); *United States v. Manning,* 56 F.3d 1188 (9th Cir.1995). Watts argued, unpersuasively, that these sister circuit decisions "should not be followed," and that they were "at odds" with the law of this Circuit. (Watts' First Mem. at 9.) However, on January 5, 2010, after Watts' motion was fully submitted, the Second Circuit decided *United States v. Payne,* 591 F.3d 46 (2d Cir.2010), which adopts the approach of the Fourth, Eighth and Ninth Circuits, and forecloses the argument that Watts makes here.

The federal criminal code contains two general statute-of-limitations provisions. The usual limitations period, pursuant to 18 U.S.C. § 3282, is five years:

> Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, *not capital,* unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282(a) (emphasis added). However, "An indictment for any offense *punishable by death* may be found at any time without limitation." *Id.* § 3281 (emphasis added).

In *Payne,* the defendant appealed his convictions for, inter alia, murder in aid of racketeering under 18 U.S.C. § 1959(a)(1), which provides for a maximum penalty of death. 591 F.3d at 51, 56–57. The defendant "contend[ed] that the § 1959(a)(1) murder-in-aid-of-racketeering counts against him were ... not 'punishable by death' within the meaning of § 3281, because in order to permit imposition of the death penalty in accordance with the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.* [ (1994) ("FDPA") ], an indictment is required to allege, and the jury is required to find, an aggravating factor set out in § 3592(c), ... and here there was no allegation or finding of any such aggravating factor." 591 F.3d at 57.

The Second Circuit flatly rejected that argument. The court held, in unambiguous terms, that "in determining whether an offense is 'punishable by death' within the meaning of § 3281 ... we look to *the character of the offense and the penalties that are set out by statute." Id.* at 58–59 (emphasis added). The panel reasoned that "a provision that subjects a person accused of certain crimes to prosecution without time limitation reflects the serious nature of those crimes," *id.* at 58, and that "in § 3281, 'Congress has made the judgment that some crimes are so serious that an offender should always be punished if caught,'" *id.* (*quoting Manning,* 56 F.3d at 1196).

Quoting the Fourth Circuit, the *Payne* court stated that "whether a crime is 'punishable by death' under § 3281 or '[not] capital' under § 3282 depends on *whether the death penalty may be imposed for the crime under the enabling statute, not on whether the death penalty is in fact available for defendants in a particular case." Payne,* 591 F.3d at 59 (*quoting Ealy,* 363 F.3d at 296–97) (other internal quotations omitted) (emphasis added). Accordingly, the court affirmed the defendant's conviction, holding that, "An offense 'punishable

by death,' within the meaning of § 3281, is one for which the statute authorizes death as a punishment, regardless of whether the death penalty is sought by the prosecution or ultimately found appropriate by the factfinder or the court." *Payne*, 591 F.3d at 59.

In reaching its decision, the Second Circuit endorsed its sister circuits' decisions in *Ealy*, *Edwards* and *Manning*, *see Payne*, 591 F.3d at 59—i.e., precisely the cases that Watts argued "should not be followed" (Watts' First Mem. at 9). All three of those decisions soundly reject Watts' reasoning, but the Fourth Circuit's decision in *Ealy* bears special mention because of its similarity to the case at bar.

In *Ealy*, the defendant advanced the same argument that Watts makes here— that "the death penalty could not have been constitutionally imposed for the § 1512 offenses [with which he was charged] because of the Supreme Court's opinion in *Furman*," and that, "As a result, . . . none of these offenses were 'punishable by death' under § 3281," *Ealy*, 363 F.3d at 296. The Fourth Circuit rejected that argument, holding that, "Even if a court cannot impose the death penalty for an offense, that does not render the offense 'not capital' with respect to other statutes predicated in their operative effect upon the concept of capital crime." *Id.* at 297 (internal quotations and citation omitted). Thus, "even if imposition of the death penalty would be unconstitutional, [the § 1512] violations alleged in this case are still 'capital crimes' for limitations purposes under §§ 3281–3282." *See id.; see also United States v. Emery*, 186 F.3d 921, 924 (8th Cir.1999) (rejecting similar *Furman*-based argument in connection with 1990 murder indicted under § 1512 more than five years after its commission).

In *Payne*, the defendant, like Watts here, "relie[d] principally on a half-centu-ry-old interpretation of 'punishable by death' " found in *United States v. Parrino*, 180 F.2d 613 (2d Cir.1950), *see Payne*, 591 F.3d at 57. In that case, the Second Circuit considered a statute that made kidnapping punishable by death, if the jury so recommended, in cases where the victim was not released unharmed. *Parrino*, 180 F.2d at 615. The *Parrino* court held that § 3281's predecessor (which also contained the phrase "punishable by death"), "did *not* make the character of the crime the test" but that, to the contrary, an offense "does not become" punishable by death unless and until all of the factors warranting imposition of the death penalty have been found by the factfinder. *See id.* (emphasis added). In *Payne*, the Second Circuit expressly rejected *Parrino's* interpretation of "punishable by death," noting that it "has been overtaken by more recent cases" and that it "has not been followed . . . either by the Supreme Court in interpreting the same kidnaping provision, [*see Smith v. United States*, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959),] or by this Court in interpreting other statutes. *Payne*, 591 F.3d at 57.

After *Payne* was decided, Watts made a feeble attempt to distinguish it. He contends that *Payne* is not controlling because it did not consider the precise argument he makes here—that a § 1512 murder is not "punishable by death" if it was committed when capital punishment was constitutionally unavailable—but rather involved "a somewhat similar claim" that a racketeering murder is not "punishable by death" if the indictment does not allege (and the jury does not find) an aggravating factor required by the FDPA for the imposition of the death penalty. (*See* Watts' Second Reply at 15–16.)

Watts' attempt to distinguish *Payne* is to no avail. As the discussion above makes clear, *Payne* soundly rejected the

reasoning that underlies Watts' argument. Moreover, *Payne* endorsed a decision (*Ealy* ) that *did* reject the very same constitutional, *Furman*-based argument that Watts advances here. Simply put, the Second Circuit has confirmed that whether an offense is "punishable by death"—i.e., "capital"—within the meaning of §§ 3181–82 depends on the penalty prescribed by Congress in the charging statute. Here, that statute is § 1512, and it provides for the death penalty.[4]

Thus, in light of *Payne*—not to mention the highly persuasive authority from other circuit courts—this Court rejects Watts' argument. The Weiss murder count is "punishable by death" within the meaning of § 3281, and therefore could have been indicted after any number of years. Accordingly, Watts' motion to dismiss Count Three as time-barred is denied.

### III. Watts' Motion to Dismiss Count Three as Barred by Double Jeopardy and Res Judicata

Watts contends that the Weiss murder count is barred by both double jeopardy and res judicata as a result of his mid-1990s prosecution in the EDNY. As described above, the EDNY indictment charged Watts under 18 U.S.C. § 1959 with conspiring to murder Weiss in aid of racketeering. In addition, one of the predicate acts alleged in the substantive RICO count was conspiracy to murder Weiss in violation of New York law.

Watts' double jeopardy/res judicata arguments fail. The double jeopardy bar does not apply here because § 1512 and § 1959 are different offenses, and extending the doctrine of res judicata to the

instant prosecution would be both unprecedented and unwarranted.

### A. The Double Jeopardy Clause

 The Double Jeopardy Clause provides that never "shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. "Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003). It is well settled that a defendant has been placed in jeopardy—that is, jeopardy has "attached" to the indictment—when the jury is empaneled and sworn. *See United States v. Podde*, 105 F.3d 813, 816 (2d Cir.1997).

"A double jeopardy inquiry must be conducted with the purposes served by the Clause in mind." *Id.* In an oft-quoted passage, the Supreme Court articulated those purposes:

> The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.... The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and

---

4. Watts has also pointed the Court to the Second Circuit's recent decision in *Matthews v. United States*, 622 F.3d 99 (2d Cir.2010). *Matthews* addressed the circumstances under which the Fifth Amendment guarantees an

unwaivable right to indictment by grand jury; the case does not bear on the meaning of "punishable by death" for statute-of-limitations purposes, and is irrelevant here.

insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

 "A double jeopardy claim cannot succeed unless the charged offenses are the same in fact and in law." *United States v. Estrada*, 320 F.3d 173, 180 (2d Cir.2003). The question of whether two offenses are the "same" offense for jeopardy purposes often arises where, as here, a defendant has been charged with violating different statutes based on the same general conduct. To answer the question of whether the two offenses are the same "in law," courts apply the familiar "same elements" test announced by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *See United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *United States v. Olmeda*, 461 F.3d 271, 282 (2d Cir.2006). The *Blockburger* test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." *Dixon*, 509 U.S. at 696, 113 S.Ct. 2849. If so, the offenses are different and double jeopardy does not apply.

### B. The Weiss Murder Count Is Not Barred by Double Jeopardy

It is undisputed that jeopardy attached to the § 1959 murder charge in the EDNY Indictment. (*See* Gov't First Opp. at 20 ("[J]eopardy had attached to all dismissed counts since trial on these counts had just commenced.").) The Government concedes that it is now "accus[ing] Watts of the same *conduct* in the § 1512 murder as it did in the § 1959 murder." (*Id.* at 23 (emphasis added).) However, the Government maintains that the current prosecu-

tion is not barred because § 1512 murder and § 1959 murder are different offenses for jeopardy purposes. The Government is correct.

 To convict a defendant of murder in aid of racketeering under § 1959, the government must prove the following five elements: "(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged [murder], and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Rahman*, 189 F.3d 88, 126 (2d Cir.1999).

 By contrast, to convict a defendant of obstruction-of-justice murder under § 1512(a), the government must prove that the defendant (1) killed the victim (2) with the intent to (a) prevent the victim's attendance or testimony in an official proceeding, or (b) prevent the victim from communicating to a law enforcement officer or judge of the United States information relating to the commission or possible commission of a federal offense. *See* 18 U.S.C. § 1512(a)(1).

As is immediately apparent, each section contains multiple elements not present in the other. Among other differences, § 1959 (but not § 1512) requires the government to prove that the alleged murder was in aid of a racketeering enterprise, whereas § 1512 (but not § 1959) requires the government to prove that the defendant intended to prevent the victim from testifying or communicating information to law enforcement. Thus, under the *Blockburger* test, § 1512 murder and § 1959 murder are different offenses, and Watts' double jeopardy argument fails.

Watts' suggestion that double jeopardy bars the current § 1512 count as a result of the *predicate act* alleging the Weiss murder that was charged in the EDNY Indictment's RICO count is also meritless. "[P]rosecutions for RICO and for its substantive predicates are distinct for double jeopardy purposes." *United States v. Gambino,* 742 F.Supp. 855, 859 (S.D.N.Y.1990); *see United States v. Esposito,* 912 F.2d 60, 64–65 (3d Cir.1990) (holding that where defendant had been acquitted on a RICO charge, double jeopardy did not bar a subsequent prosecution for the underlying predicate acts); *see also United States v. Gonzalez,* 921 F.2d 1530, 1536 (11th Cir.1991) (concluding that "Congress intended RICO and its predicate crimes to be separate offenses and allow successive prosecutions"). In short, § 1512 obstruction-of-justice murder is not the "same offense" as a predicate act of racketeering alleging conspiracy to murder in violation of state law. As the Government correctly states, the § 1512 murder count is "a charge that [Watts] has never before faced." (Gov't First Opp. at 21.)

In arguing to the contrary, Watts conspicuously ignores *Blockburger,* failing even to cite it in his briefs. Instead, Watts offers three arguments, each of which has some initial appeal, but all of which, upon reflection, fail.

Watts' principal argument, which underlies and to some extent encompasses the other two, is that double jeopardy bars Count Three because it charges Watts for a second time with the *same conduct*—the 1989 murder of Frederick Weiss. (*See* Watts' First Mem. at 18 ("Thirteen years later, the government seeks to prosecute Watts for the same crime by a different name....").) However, as explained above, whether two charged offenses are the same "in fact"—i.e., whether the conduct underlying the offenses is the same—

is only one part of the double jeopardy inquiry. *See United States v. Olmeda,* 461 F.3d 271, 282 (2d Cir.2006). As the Second Circuit has made clear, "It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *United States v. Chacko,* 169 F.3d 140, 146 (2d Cir.1999). Indeed, in *United States v. Dixon,* 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the Supreme Court rejected the notion that a "same-conduct" rule should govern whether double jeopardy bars a prosecution. *See id.* at 703–04, 113 S.Ct. 2849.

Watts attempts to skirt the settled rule that in order for double jeopardy to apply, the two offenses in question must be the same not merely in fact but "in law"—that is, under the *Blockburger* "same elements" test. He points, for example, to the Second Circuit's decision in *Olmeda,* 461 F.3d 271, which held that double jeopardy barred an indictment in this District charging unlawful possession of ammunition because a prior North Carolina indictment for ammunition possession encompassed the same conduct. But in *Olmeda,* "there [was] no question that the offenses at issue in the Southern District and North Carolina indictments are the same 'in law' as both allege possession violations of the *same criminal statute*." *Id.* at 282 (emphasis added) (*citing Blockburger,* 284 U.S. at 304, 52 S.Ct. 180). The case is therefore inapplicable here, where there is "no question" that the *conduct* underlying the successive murder counts is the same, but where Watts has been charged under different statutes, § 1512 and § 1959— which, as established above, proscribe legally distinct offenses for jeopardy purposes.

Watts' second argument in support of his double jeopardy claim proceeds as follows: the Government concededly will not allege that Watts actually killed Weiss, but rather that he aided and abetted the murder; an aiding and abetting charge is implicit in any substantive count in an indictment, including conspiracy; therefore, "the government has already prosecuted Watts on that theory, either actually or constructively." (*See* Watts' First Mem. at 19–20.) This is merely a different (and somewhat more confusing) way of arguing that Watts has already been prosecuted for his alleged conduct in connection with the Weiss murder. The argument therefore fails for the same reasons stated above—that is, Weiss may be correct that an aiding and abetting charge is implicit in every indictment, *see United States v. Mucciante*, 21 F.3d 1228, 1234 (2d Cir.1994); *United States v. Sabatino*, 943 F.2d 94, 99–100 (1st Cir.1991), but that does not obscure the fact that he has been charged with *different substantive offenses.* Given that § 1512 and § 1959 are distinct for jeopardy purposes, aiding and abetting § 1512 murder and aiding and abetting § 1959 murder necessarily are as well.[5]

Third, Watts argues that double jeopardy bars Count Three because, "as a practical matter, [racketeering] murder is a species of lesser-included offense of § 1512 murder in the circumstances at hand." (Watts' First Mem. at 20 (internal quotations and citations omitted).) Even if the Court were, for a moment, to pursue this line of reasoning, Watts has it backwards: murder in aid of racketeering, in the Mafia context, is more aptly described as the "greater" offense, of which obstruction-of-justice murder is one variation. But regardless, if § 1959 murder qualified as a lesser-included offense of § 1512 murder—or vice versa—then double jeopardy would bar Count Three. *See United States v. Gaskin*, 364 F.3d 438, 453 (2d Cir.2004) ("Double jeopardy proscribes multiple prosecutions not only for the same offense but also when one offense is a lesser included offense of the other." (internal quotations and citation omitted)).

That is not the case here. As established above, § 1512 murder and § 1959 murder contain different elements and are, under *Blockburger*, different offenses. Thus, Watts' "lesser-included offense" argument fails.

Yet the argument is not entirely unpersuasive. There is considerable truth in Watts' contention that "anyone accused as an organized crime associate of killing a potential witness to prevent his testimony and cooperation also acts to maintain [his] position in a racketeering enterprise"—i.e., any mobster who commits obstruction-of-justice murder also commits murder in aid of racketeering. (*See* Watts' First Mem. at 20 (internal quotations and citations omitted).) The Court agrees that, in the specific context of organized crime, § 1512 murder and § 1959 murder often overlap. On the other hand, it is not difficult to imagine a scenario in which "an organized crime associate" kills a witness or potential witness for personal reasons unrelated to the enterprise. Moreover, *outside* the organized crime context, obstruction-of-justice murder is entirely separate from mur-

---

**5.** The Court notes, further, that aiding and abetting a *conspiracy* to murder Weiss—the aiding and abetting charge arguably implicit in the EDNY Indictment—is not the same offense as aiding and abetting Weiss' *murder,* which is the aiding and abetting charge in the present Indictment. *Cf. United States v. Gar-* *cia,* No. 3:97CR48, 1998 WL 744102, at *1, 1998 U.S. Dist. LEXIS 16720, at *1 (D.Conn. Sept. 9, 1998) (involving indictment charging, inter alia, aiding and abetting attempted murder and aiding and abetting conspiracy to commit the same murder).

der in aid of racketeering. Thus, Watts' argument, stripped to its core, is that because, *in this particular case*, the alleged Weiss murder constitutes both obstruction-of-justice murder *and* murder in aid of racketeering, double jeopardy applies. That is merely another variation on the argument that the § 1512 charge is barred because it is based on the same *conduct* as the § 1959 charge. As discussed above, that argument fails.

The Court is also sensitive to Watts' concern that, "With the expansion of federal jurisdiction, the U.S. Code has become a sprawling compendium of technically distinct [ ]though factually overlapping statutory offenses," which enables prosecutors to repackage and re-allege stale and already-prosecuted conduct. (*See id.* at 21 (internal quotations and citation omitted).) But while the Court shares this concern—particularly in the context of the RICO organized crime prosecutions cycled through this courthouse and the one across the East River, involving the same players and often, it seems, the same crimes—the Weiss murder count in the instant Indictment is *not* a compelling example of the problem. Racketeering murder and obstruction-of-justice murder are distinctly different offenses, intended to punish and deter different types of criminal conduct and to further different societal interests. One statute, § 1959, seeks to vindicate the "Federal Government's strong interest ... in suppressing the activities of organized criminal enterprises," S.Rep. No. 98–225, at 305 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3484, while the other, § 1512, seeks to ensure a functioning criminal justice system by protecting witnesses and encouraging their cooperation with law enforcement, *see* 18 U.S.C. § 1512 note. This helps explain why the successive prosecutions of Watts under § 1959 and § 1512 are not constitutionally offensive.

For the reasons discussed above, the Court concludes that double jeopardy does not prohibit the Government from prosecuting Watts for the Weiss murder under 18 U.S.C. § 1512. Accordingly, Watts' motion to dismiss Count Three as barred by double jeopardy is denied.

### C. The Weiss Murder Count Is Not Precluded by Res Judicata

▇ Watts further contends that "beyond the jeopardy bar," the Weiss murder count "is independently barred by the clause's *res judicata* component." (Watts' First Mem. at 22.) He argues that "[t]he § 1512 claim" is precluded because it "could have been raised"—but was not—in the EDNY prosecution. (*See id.* (internal quotations and citation omitted).) This argument calls for an extension of res judicata in the criminal context that is unsupported by case law and that would run contrary to accepted notions of prosecutorial discretion.

### 1. The Application of "Res Judicata" in the Criminal Context

▇ The basic tenets of preclusion law in the *civil* context are well established. "The doctrine of *res judicata*, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284–85 (2d Cir.2000) (*quoting Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)). The related doctrine of collateral estoppel, or issue preclusion, "precludes a party from relitigating in a subsequent proceeding an issue of law or fact ... if ... (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in

the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Boguslavsky v. Kaplan*, 159 F.3d 715, 719–20 (2d Cir.1998) (internal quotations and citation omitted).

For nearly a century now, certain aspects of civil preclusion doctrine have been applied in the criminal context. As early as 1915, the Supreme Court held that the "fund[a]mental principle of jurisprudence ... that a question of fact or of law distinctly put in issue and directly determined by a court of competent jurisdiction cannot afterwards be disputed between the same parties ... is as applicable to the decisions of criminal courts as to those of civil jurisdiction." *Frank v. Mangum*, 237 U.S. 309, 333–34, 35 S.Ct. 582, 59 L.Ed. 969 (1915).

The next year, the Supreme Court confirmed that "the doctrine *of res judicata* does ... exist for criminal cases." *See United States v. Oppenheimer*, 242 U.S. 85, 87, 37 S.Ct. 68, 61 L.Ed. 161 (1916). Justice Holmes concluded that a prior adjudication, "whether it takes the form of an acquittal or conviction, is final as to ... the matters determined by it," and may be pleaded as a bar in a subsequent prosecution. *See id.* at 88, 37 S.Ct. 68.

In 1948, in an oft-cited decision, and one relied upon by Watts, the Supreme Court again held that "*res judicata* ... applies to criminal as well as civil proceedings and *operates to conclude those matters in issue which the verdict determined* though the offenses be different." *Sealfon v. United States*, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948) (internal citation omitted) (emphasis added). In *Sealfon*, the Court held that whether "res judicata" precludes a second prosecution depends upon "whether the jury's verdict in the [first] trial was a determination favorable to [the defendant] of the facts essential to convic-

tion of the [subsequently charged] offense"—which, in turn, "depends upon the facts adduced at each trial." *Id.* at 578–79, 68 S.Ct. 237.

The *Sealfon* Court concluded that the first jury's not guilty verdict had necessarily determined that a certain letter written by the defendant did not establish the existence of an agreement to defraud. *See id.* at 579–80, 68 S.Ct. 237. In the subsequent prosecution, however, the government made a "second attempt" to prove the alleged agreement through the letter. *See id.* In other words, the government sought to prove facts that had already been decided against it in the prior trial. That, the Court held, "the prosecution may not do." *Id.* at 580, 68 S.Ct. 237.

Although *Oppenheimer* and *Sealfon* expressly state that "res judicata" applies in the criminal context, both cases are now widely understood as referring only to *collateral estoppel*, not claim preclusion. As the Second Circuit has stated, "the Supreme Court ... recognized in federal criminal prosecutions a claim of what was called res judicata, but which today would be described as collateral estoppel." *United States ex rel. DiGiangiemo v. Regan*, 528 F.2d 1262, 1264 (2d Cir.1975) (*citing Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68); *accord United States v. Flemmi*, 283 F.Supp.2d 400, 404–05 (D.Mass.2003) ("What Justice Holmes had in mind [in *Oppenheimer* ] was the estoppel effect of an adjudication on the merits, and despite his rhetorical reference to '*res judicata*,' did not suggest that the civil doctrine of claim preclusion was in any sense at issue.") In *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Supreme Court clarified that it is the doctrine of *collateral estoppel* that "has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v.*

*Oppenheimer." See Ashe,* 397 U.S. at 443, 90 S.Ct. 1189.

■ Thus, the rule that emerges from *Oppenheimer, Sealfon* and their progeny is that the doctrine of collateral estoppel applies in the criminal context to bar a second prosecution where the jury in the first trial, either expressly or by necessary implication, found for the defendant on an issue essential to conviction in the subsequent prosecution. *See Sealfon,* 332 U.S. at 578–79, 68 S.Ct. 237; *United States v. Kramer,* 289 F.2d 909, 913 (2d Cir.1961). Fundamentally, "issue preclusion is necessary to give the acquitted defendant the full benefit of the protections in the Double Jeopardy Clause." *United States v. Bailin,* 977 F.2d 270, 277–78 (7th Cir.1992) (explaining that collateral estoppel protects against "the Government ... hav[ing] the opportunity to hone its presentation on those issues which have already been decided against it"). As the Supreme Court noted in *United States v. Dixon,* when it discarded a "same-conduct" test that had afforded more expansive double jeopardy protection than the *Blockburger* "same elements" test, collateral estoppel discourages prosecutors from "bring[ing] separate prosecutions in order to perfect their case," as "an acquittal in the first prosecution might well bar litigation of certain facts essential to the second one." *See Dixon,* 509 U.S. at 710 n. 15, 113 S.Ct. 2849: *see also* 26 *Moore's Federal Practice–Criminal Procedure* § 629.22 ("Offsetting the disadvantage to the accused from the [*Blockburger*] same elements test is the application of the doctrine of collateral estoppel. . . .").

Here, for example, had the jury in the first Watts trial found him not guilty of conspiring to murder Weiss, it is possible, depending on the facts adduced at the trial, that he could now assert collateral estoppel as a bar to Count Three in the instant Indictment. But Watts cannot benefit from collateral estoppel because the EDNY trial did not even reach a jury, much less result in a not guilty verdict. Rather, it ended with Watts' mid-trial plea. Accordingly, nothing was "decided" in the EDNY trial in the sense required for the application of collateral estoppel.

### 2. Watts Unsuccessfully Attempts to Invoke Claim Preclusion

Foreclosed from relying on collateral estoppel, the preclusion doctrine that the Supreme Court has recognized as applicable in criminal prosecutions, Watts attempts to invoke *claim preclusion.* His argument, in essence, is that the government must, in the first instance (here, the EDNY Indictment), charge *all* offenses arising out of a given transaction or series of transactions (here, the Weiss murder), or lose the right to bring those charges in a subsequent prosecution. That is not the law, nor should it be.

Unlike collateral estoppel, "the Supreme Court has never recognized *res judicata* in the sense of claim preclusion as applicable to a criminal proceeding; it has never precluded prosecution on a charge which had not been but might have been prosecuted in a previous criminal proceeding." *United States v. Flemmi,* 283 F.Supp.2d 400, 405 (D.Mass.2003) (internal quotations omitted). Indeed, the Supreme Court has consistently declined to hold that the government is required "to join at one trial all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction." *See Ashe v. Swenson,* 397 U.S. 436, 453–54, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring); *see also Thompson v. Oklahoma,* 429 U.S. 1053, 1054, 97 S.Ct. 768, 50 L.Ed.2d 770 (1977) (Brennan, J., dissenting from denial of certiorari), and cases collected therein.

In his briefs, Watts parrots classic claim preclusion language from the *civil* context, but fails to cite a single case that supports precluding the government from charging a criminal offense because it "could have been raised" in a prior prosecution. Watts points, for example, to the First Circuit's decision in *United States v. Cunan,* 156 F.3d 110 (1st Cir.1998), but *Cunan*'s holding is quite narrow, and predicated on reasoning that has no application here. In that case, the First Circuit held that *"res judicata* bars a *criminal forfeiture* following dismissal with prejudice of a prior *civil forfeiture proceeding involving the same property,"* principally because it considered a criminal forfeiture action to be procedurally almost identical to a civil forfeiture action. *See id.* at 116–17, 121 (emphasis added). As at least two district courts in the First Circuit have subsequently recognized, *Cunan* "can only be understood in its peculiar factual context." *See United States v. Alonso,* 602 F.Supp.2d 297, 305 n. 5 (D.P.R.2008); *Flemmi,* 283 F.Supp.2d at 405. *Cunan* does not suggest that res judicata should preclude the government from prosecuting an offense that it could have, but did not, charge in a prior indictment.

Watts takes one of those two district court decisions, *Flemmi,* and attempts to twist it in his favor by extracting Judge Stearns' dicta that he was "not prepared to go as far as the government urges" and hold that the government's dismissal of an indictment pursuant to Federal Rule of Criminal Procedure 48(a) "could never have a claim preclusive effect," 283 F.Supp.2d at 411. The question in *Flemmi* was whether a prior dismissal with prejudice, pursuant to a plea agreement, of the unresolved counts in an indictment barred a subsequent prosecution on some or all of those counts. *See id.* at 402. First, Judge Stearns carefully distinguished between res judicata and collateral

estoppel, making clear that only the latter has been widely accepted as applicable in the criminal context. *See id.* at 404–05. Second, Judge Stearns closely examined the First Circuit's decision in *Cunan,* concluding that its narrow holding did not require the application of claim preclusion in the case before him. *See id.* at 405–06. Finally, Judge Stearns expressed a variety of concerns with affording claim preclusive effect to such a dismissal, and held that, on the facts before him, res judicata did *not* bar the subsequent prosecution. *See id.* at 407–11. Thus, *Flemmi* is of no help to Watts here.

Watts also cites a decision of the Connecticut Supreme Court, *State v. Ellis,* 197 Conn. 436, 497 A.2d 974 (1985), which, far from supporting Watts, lucidly articulates many of the reasons why precluding prosecutors from charging an offense that they could have charged in a prior indictment is not a sound idea. The *Ellis* defendants were initially charged with, inter alia, murder and kidnapping. *Id.* at 438, 497 A.2d 974. After the indictment was dismissed as time-barred, the state rearrested the defendants and charged them with capital felony—an offense with no limitations period—based on the same kidnapping and murder. *Id.* at 438–39, 497 A.2d 974. The defendants contended that res judicata barred the second prosecution. *Id.* at 439, 497 A.2d 974. Thus, the case squarely presented the question of "whether the state must join in a single prosecution all discrete statutory offenses arising from a single criminal transaction." *Id.* at 438, 497 A.2d 974. The district court had answered that question in the affirmative.

Although the Connecticut Supreme Court did not foreclose the possibility that "[t]he case may arise where the doctrine of res judicata will require dismissal of charges not joined in an earlier prosecution," it firmly rejected "the type of

joinder envisioned by the trial court's holding," concluding that "the essentially public objectives of the criminal law advise against the uncritical adoption of civil joinder concepts." *See id.* at 470–71, 474–76 & n. 27, 497 A.2d 974. Connecticut's high court reasoned that although "finality," one of res judicata's principal purposes,

> "serves an important role in civil cases, where it originated and where society's primary concern is to provide a means of peaceful, swift and impartial resolution of private disputes.... It is less relevant in criminal cases where the preeminent concern is to reach a correct result and where other considerations peculiar to criminal prosecutions may outweigh the need to avoid repetitive litigation...." *People v. Plevy*, 52 N.Y.2d 58, 64, 436 N.Y.S.2d 224, 417 N.E.2d 518 (1980). In civil litigation it is not unreasonable to require plaintiffs seeking to vindicate personal interests to join all related theories of recovery in a single lawsuit. But the state's attorney represents the broader public interest in the effective administration of criminal justice. The incongruous equation between the terms "cause of action" and "criminal prosecution" reflects the very different purposes served by each. The state's attorney does not bring a "lawsuit" to recover in "damages" on a "bundle of rights." The decision to prosecute is the initial step in the effectuation of broad social policies represented by the criminal law itself.

*Id.* at 470, 497 A.2d 974 (internal citation omitted).

██ As the *Ellis* court noted, prosecutors have traditionally been accorded "broad discretion in determining what crime or crimes to charge in any particular situation." *See id.* at 478, 497 A.2d 974 (internal quotations and citation omitted). And, "unless constitutional or other compelling reasons require otherwise," courts should "abstain from setting policy for the performance of the prosecutorial function." *See id.* In *Ellis*, it was evident that, "for whatever reason, the state's attorney did not believe that capital felony was the appropriate crime with which to initially charge the[ ] defendants." *Id.* at 478 n. 28, 497 A.2d 974. The Connecticut court properly "decline[d] to adopt a rule which would have required him to do so." *Id.*

This Court agrees with the reasoning espoused in *Ellis*. A rule requiring the government to join in a single prosecution all charges arising out of the same criminal transaction would be contrary to the public's interest in ensuring that justice is, in the final analysis, done. Moreover, it would have the undesirable effect of encouraging prosecutors to indict defendants for every *conceivable* statutory offense arising out of the criminal transaction at issue, since no offense arising out of that transaction could be charged in a subsequent indictment. This would likely result in the filing of (even more) voluminous indictments, increase the risk of defendants being saddled with repetitive and meritless charges, and make for lengthy, inefficient trials.

Furthermore, such a rule would inevitably give rise to thorny pretrial litigation disputing what the government knew "then," and what it knows "now"—here, for example, the question would be whether the EDNY USAO was sufficiently aware in 1993 of facts enabling it to charge Watts with obstruction-of-justice murder under § 1512.[6] For even if a broad claim

---

6. Watts points out that the EDNY Indictment specifically alleged that the conspirators were

"concerned that ... Weiss was cooperating with the government" (Watts' First Mem. at

preclusion rule were imported into the criminal context, it presumably would not—as Watts seems to acknowledge (*see* Watts' First Mem. at 22–23 & n. 30)—bar the government from charging an offense that arises out of conduct already alleged in a prior indictment, but that in truth could *not* have been brought in the earlier proceeding because the government was not aware of the particular facts making out the offense (for example, that an organized crime associate accused of murder also believed the victim to be cooperating with law enforcement).

Thus, in any given case, a court might be forced to make a ruling based largely on its examination of the evidence possessed by prosecutors at the time of the first indictment. This would, in effect, put the judge in the uncomfortable—and inappropriate—position of going back in time to play prosecutor in order to decide whether the offense could have and should have been brought in the prior prosecution. For this and the many other reasons discussed above, claim preclusion should not and does not apply in the criminal context to require prosecutors to charge in the first instance all offenses growing out of a single transaction.

In addition to *Cunan*, *Flemmi* and *Ellis*, Watts cites a handful of other criminal cases that purportedly support the application of claim preclusion in the case at bar, none of which warrants discussion. They do not, in fact, support Watts' res judicata argument, and are easily distinguished. *See State v. Dann*, 167 Vt. 119, 702 A.2d 105, 109 (1997) (expressly declining to reach the question of "whether claim preclusion, a concept more commonly raised

in civil litigation, pertains to criminal proceedings"); *Alonso*, 602 F.Supp.2d at 304–06 (concluding that criminal forfeiture count was not barred by prior judgment in civil forfeiture action); *United States v. Auffenberg*, No.2007–0047, 2008 WL 713645, at *2–4 (D.Vi. Feb. 7, 2008) (holding that defendant's prosecution was not barred by prior civil action because "punishment was not its object"); *United States v. Bhatia*, No. CR 05–0334, 2007 WL 2554402, at *5–6 (N.D.Cal. Sept. 4, 2007) (holding that dismissal with prejudice in civil suit did not bar subsequent prosecution because the two actions were not sufficiently related).

In sum, the Court concludes that the doctrine of res judicata—i.e., claim preclusion—does not bar the Government from prosecuting Watts for the Weiss murder under § 1512. Accordingly, Watts' motion to dismiss Count Three on preclusion grounds is denied.

## IV. Watts' Motion to Dismiss Count Three as Barred by His 1996 Plea Agreement

■ Watts next attacks the Weiss murder count on the ground that it is barred by the Plea Agreement he entered into in 1996 with the EDNY USAO. The argument fails.

### A. Legal Standard

■ The Second Circuit "ha[s] long interpreted plea agreements under principles of contract law," while "not[ing] that plea agreements ... are unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *In re Altro*, 180 F.3d

---

21), and claims that "there is no real dispute that the government could have proceeded under § 1512 in 1996—though perhaps with less evidence than it professes to have now" (Watts' First Reply at 5). The Government

states that the information it now possesses regarding the Weiss murder is "different" than the information known to the EDNY USAO at the time of the first Watts trial. (Gov't First Mem. at 28 n. 15.)

372, 375 (2d Cir.1999) (internal quotations and citation omitted). These fairness concerns are "rooted in an appreciation of the fact that, unlike ordinary contracts, plea agreements call for defendants to waive fundamental constitutional rights, and in an awareness that the Government generally drafts the agreement and enjoys significant advantages in bargaining power." *Id.* "In interpreting plea agreements drafted by federal prosecutors, 'the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *United States v. Gotti,* 457 F.Supp.2d 411, 415 (S.D.N.Y. 2006) (*quoting United States v. Ready,* 82 F.3d 551, 558 (2d Cir.1996)).

■■■■■ In keeping with these general principles, the government is held to "the most meticulous standards of both promise and performance." *In re Altro,* 180 F.3d at 375 (internal quotations and citation omitted). Courts "determine whether a plea agreement has been breached by looking to the reasonable understanding of the parties," *id.,* and, "if there is any ambiguity, the terms of a plea agreement, like the terms of a contract, must be construed against the drafter," *Gotti,* 457 F.Supp.2d at 415.

■■■■ It is the settled law of this Circuit that "[a] 'plea agreement binds *only the office of the United States Attorney for the district in which the plea is entered* unless it affirmatively appears that the agreement contemplates a broader restriction,' or unless 'there [is] evidence to show that [a prosecutor's office] is attempting to evade its own obligations [under the plea agreement] by transferring a prosecution' to another office." *United States v. Salameh,* 152 F.3d 88, 120 (2d Cir.1998) (*quot-*

*ing United States v. Annabi,* 771 F.2d 670, 672 (2d Cir.1985) (per curiam); *United States v. Alessi,* 544 F.2d 1139, 1154 (2d Cir.1976)) (emphasis added). "This is so even if the plea agreement purports to bind 'the Government.'" *United States v. Brown,* Nos. 99–1230(L), 99–1762, 2002 WL 34244994, at *2 (2d Cir. Apr. 26, 2002): *accord Salameh,* 152 F.3d at 120 ("The mere use of the term 'government' in the plea agreement does not create an affirmative appearance that the agreement contemplated barring districts other than the particular district entering into the agreement." (internal quotations and citation omitted)).

### B. Watts' 1996 Plea Agreement Does Not Bind the SDNY USAO

There is no indication that the parties to the 1996 Plea Agreement contemplated that it would bar the prosecution of Watts in any district other than the EDNY. To the contrary, the express terms of the Agreement explicitly limit its reach to the EDNY, stating that it "cannot bind other federal, state or local prosecuting authorities." Plea Agreement ¶ 7. While any ambiguous terms in plea agreements must be construed strictly against the government as drafter, there is nothing ambiguous about whether Watts' Agreement purports to bind districts other than the EDNY—it does not. Indeed, Watts essentially admits as much, asserting that the current prosecution violates the Agreement "in spirit *if not in letter*" (Watts' First Mem. at 24 (emphasis added)). Watts' reasoning in this regard is not persuasive.

He offers no meaningful support for his claim that he "reasonably understood" the Agreement to bar subsequent prosecutions in this District. (*See id.* at 24–25.) He does not claim, for example, that the SDNY USAO was in any way consulted or involved in the plea negotiations. Instead,

he merely points to the fact that, at his sentencing, EDNY Assistant United States Attorney Laura Ward ("AUSA Ward") stated that, as per the terms of the Plea Agreement, "the *government* moves to dismiss the remaining charges in the indictment" (Watts Sentencing Tr. at 19 (emphasis added)).

AUSA Ward's reference to "the government" is hardly noteworthy. First of all, it is well established that even when a *written* plea agreement itself refers to "the government," that does not make it binding on any USAO other than the USAO entering into the agreement. *See Brown,* 2002 WL 34244994, at \*2; *Salameh,* 152 F.3d at 120. Here, the written Agreement makes no reference to "the Government" or "the United States," but rather only to "the United States Attorney's Office for the Eastern District of New York," or the "Office." *See* Plea Agreement at 1.

Further, in point of fact, because the Government, *not* the EDNY USAO, was the party to the litigation, AUSA Ward correctly referred to "the government" as the entity taking the action of moving to dismiss the indictment. Moreover, even in situations where it *would be* more accurate or appropriate to refer to the individual USAO, prosecutors, defense attorneys and judges in open court habitually refer to "the government." Indeed, in *Salameh* and *United States v. Abbamonte,* 759 F.2d 1065 (2d Cir.1985), the Second Circuit found that oral references to "the government" by counsel during plea proceedings—oral references that were considerably more suggestive of an agreement to bind other USAOs than AUSA Ward's statement here—should not be interpreted as reflecting any such intent.

In *Abbamonte,* for example, defense counsel stated the terms of a plea agreement between the defendant and the SDNY USAO as follows: "The *govern-*

*ment* has agreed that … this plea will cover all charges that could have come about by the *government* arising out of these facts." 759 F.2d at 1072 (emphasis added), *overruled in part on other grounds by United States v. Macchia,* 41 F.3d 35, 38–39 (2d Cir.1994). The panel found that there was nevertheless "no indication that the plea agreement contemplated any restriction on prosecutions initiated in any [other] district." *See id.* Similarly, in *Salameh,* defense counsel (and the court) stated that under the terms of an "oral supplement" to the plea agreement at issue, "the *Government* will not bring any charges arising out of [the defendant's] entry into the United States." 152 F.3d at 119 (emphasis added). As in *Abbamonte,* the Second Circuit held that the mere use of the word "Government" was not evidence that the agreement contemplated barring prosecutions in districts other than the one in which the plea was entered. *See id.* at 119–20.

Watts' reliance on his asserted belief that the 1996 Agreement barred prosecutions in this District is also foreclosed by the Agreement's integration clause. The terms of the Agreement expressly limit its reach to the EDNY USAO, and paragraph 8 provides that, "No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by the parties," Plea Agreement ¶ 8. Watts does not claim that any such writing exists. Moreover, at the time the plea was entered, when asked by the presiding judge whether, "In your own mind … you have been promised anything else in return for pleading guilty," he answered, "No, your Honor." (Gov't First Opp. Ex. C (Watts Trial Tr., Feb. 15, 1996), at 567.) Thus, as the Second Circuit stated in *Brown,* "where—as here—the Government incorporates into

the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement, a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach." 2002 WL 34244994, at *2 (internal quotations and citation omitted).

Nor does Watts present any evidence that the EDNY USAO is attempting to evade its obligations under the Plea Agreement by transferring the prosecution to this District. Instead, Watts makes the geographically colorful, but substantively meritless, allegation that to "escape" the 1996 Plea Agreement, "the government has simply walked [the Weiss murder count] over the East River and across the Brooklyn Bridge, bringing it in Foley Square rather than Cadman Plaza" (Watts' First Mem. at 23–24). To the contrary, the SDNY USAO has independently investigated the Weiss murder (as well as other alleged criminal conduct), and has charged Watts accordingly. Watts has not been deprived of the benefit of his bargain; he has received exactly what he was promised: no further prosecutions in the EDNY arising out of the conduct alleged in the 1993 Indictment.

Reduced to its essence, Watts' motion rests on his implicit contention that a plea agreement entered into by a Mafia associate in the Southern or Eastern District—whose courthouses are only two miles apart, and whose USAOs investigate and prosecute the same organized crime families—should naturally bind prosecutors in both districts. But that is not the law of this Circuit. Neither the fact that Watts is charged with conduct that was the subject of the EDNY Indictment, nor the geographic proximity of the two districts, can obscure the unambiguous language of the Agreement he entered into with the

EDNY USAO—an agreement that did not involve, and that does not now bind, the SDNY USAO.

Thus, for the reasons discussed above, the Court concludes that the EDNY Plea Agreement does not bar the SDNY USAO from prosecuting Watts for the Weiss murder. Accordingly, Watts' motion to dismiss Count Three as barred by his Plea Agreement is denied.

## V. Watts' Motion to Dismiss Count Three on the Ground That the Government Is Estopped from Asserting That He Murdered Weiss or Aided and Abetted the Murder

Watts moves to dismiss the Weiss murder count on the ground that the Government cannot now claim that he murdered Weiss or aided and abetted the murder because it has advanced an inconsistent position in previous trials—namely, that Weiss was killed by members of the DeCavalcante Family. Watts' argument appears to invoke both the doctrine of judicial estoppel and the Due Process Clause. (*See, e.g.*, Watts' First Mem. at 29 ("[T]he Court should dismiss Count [Three] as ... estopped by inconsistent prosecutorial theories."), 27 ("Due process forbids the use of such inconsistent, irreconcilable theories to prosecute different defendants for the same event[s]." (internal quotations and citation omitted)).) The argument fails because it is premature, and because it is, at least at this stage, without merit.

### A. The Use of Inconsistent Prosecutorial Theories

There is no clear consensus in the federal courts as to whether the government can be precluded from raising an argument at a criminal trial because it took a factually incompatible position in pursuing a conviction against another defendant at another trial. Several courts of appeals

have held that the use of inherently inconsistent, irreconcilable theories to secure convictions against multiple defendants in different prosecutions violates due process. *See Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir.2000) ("[T]he use of inherently factually contradictory theories violates the principles of due process."); *accord, e.g., Stumpf v. Mitchell*, 367 F.3d 594, 611 (6th Cir.2004), *vacated on other grounds, Bradshaw v. Stumpf*, 545 U.S. 175, 186–88, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005); *Thompson v. Calderon*, 120 F.3d 1045, 1055–60 (9th Cir.1997), *vacated on other grounds*, 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). *But see Beathard v. Johnson*, 177 F.3d 340, 348 (5th Cir.1999) ("[A] prosecutor can make inconsistent arguments at the separate trials of codefendants without violating the due process clause."). On the other hand, several circuits have found, or at least suggested, that the doctrine of judicial estoppel may not be applied in a criminal case to bar the prosecution from asserting factually inconsistent theories. *See Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir.1995) (rejecting contention "that the state was barred by the doctrine of judicial estoppel from taking a position in [defendant's] trial inconsistent with that it had taken in [another defendant's trial]," and noting that judicial estoppel "has apparently never been applied against the government in a criminal case"); *accord, e.g., United States v. Grap*, 368 F.3d 824, 830 (8th Cir.2004); *United States v. Kattar*, 840 F.2d 118, 129 n. 7 (1st Cir.1988).

The Second Circuit has not decided whether—or on what basis—the government may be barred from advancing factually inconsistent theories in different criminal trials. *See United States v. Boyle*, 283 Fed.Appx. 825 (2d Cir.2007) (summary order); *United States v. Rosa*, 17 F.3d 1531 (2d Cir.1994). In *Boyle*, the defendant appealed his conviction on the ground that

"his due process rights were violated because the government advanced a theory of criminal liability ... that was factually inconsistent with one pursued by the government in a previous action." 283 Fed. Appx. at 826. The panel expressly declined to decide whether " 'the use of inherently factually contradictory theories violates the principles of due process.' " *Id.* (*quoting Smith*, 205 F.3d at 1052). Instead, the court stated that, "This case does not ... present the opportunity for us to consider the issue," because the government's theories in the two actions—that the same bank robbery had been committed by two different enterprises working together—were not, in fact, inconsistent. *See id.*

In *Rosa*, the defendant appealed his conviction for conspiring to receive stolen goods, asserting the "judicial estoppel argument" that the government should not have been allowed to argue that the conspiracy began in Brooklyn because it had argued in a previous trial that the conspiracy began in the Southern District. 17 F.3d at 1548. Without commenting on the doctrine's availability in criminal cases, the Second Circuit declined to apply judicial estoppel because, "The government's positions were not inconsistent." *Id.*

## B. Watts' Estoppel Argument Fails Because It Is Premature

The Court need not and does not decide whether the government is permitted to advance a theory in a criminal case that is factually inconsistent with one it has asserted in a prior prosecution. Even assuming that it is not, Watts' argument fails because it is, in this case, premature.

Federal Rule of Criminal Procedure 12(b), which governs pretrial motions, provides that "any defense, objection, or request that *the court can determine without*

*a trial of the general issue"* may be raised before trial by motion. Fed.R.Crim.P. 12(b) (emphasis added). Thus, "A Rule 12 motion to dismiss is not the proper way to raise a factual defense." 24 *Moore's Federal Practice—Criminal Procedure* § 612.02. As is well established, "A defendant may not contest the sufficiency of the government's proof in a pre-trial motion 'unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial.'" *United States v. Urso,* 369 F.Supp.2d 254, 259 (E.D.N.Y.2005) (*quoting United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998)).

At its core, Watts' argument, though couched in the language of estoppel, is a challenge to the sufficiency of the Government's evidence, and is thus premature under Rule 12(b). Watts argues that:

> the Gambinos' preparatory attempts to kill Weiss—futile as they were—could not have aided and abetted the DeCavalcantes in later killing him independently. It is not enough that Watts allegedly agreed or tried to murder Weiss, nor even that he knew the DeCavalcantes were to murder Weiss and hoped they would succeed. Instead, Watts must have actually *aided* the DeCavalcantes in carrying out the assassination.

(Watts' First Mem. at 26–27 (internal citation omitted) (emphasis in original).) Thus, fairly read, the crux of Watts' argument is not that the Government's theory of the Weiss murder is *inconsistent* with that asserted in prior prosecutions, but rather that the Government's allegations regarding Watts' role in the murder are *insufficient* to convict him of aiding and abetting, much less murder. Indeed, in *United States v. Gotti,* No. S4 02 CR 743, 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004), the moving defendants, members of the Gambino Family, advanced a similar argument based on the fact that "the Government has claimed elsewhere that members of the New Jersey-based DeCavalcante family murdered Weiss," and Judge Casey reached the same conclusion: "The[ ] argument is essentially that the Government does not possess sufficient evidence to convict them of murdering or aiding and abetting the murder of Weiss.... This argument is premature and must be rejected." *Id.* at *1.

Nor has the Government "made what can fairly be described as a full proffer of the evidence it intends to present at trial," *Alfonso,* 143 F.3d at 776. Watts offers no support for his suggestion that because the government has presented evidence in previous trials charging different defendants in connection with the Weiss murder, it has "fully proffered" the evidence it intends to present at *this* trial. It is "rare" that the government fully proffers its evidence prior to trial. *See United States v. Gotti,* 457 F.Supp.2d 411, 421 (S.D.N.Y. 2006); *see, e.g., Urso,* 369 F.Supp.2d at 259–60 (finding that government's memorandum briefly summarizing anticipated testimony and evidence constituted "limited proffer," not "full proffer"). The Government has not made any such proffer here. Accordingly, Watts' challenge to the sufficiency of the evidence supporting the Weiss murder count is premature.

However, even if Watts' estoppel/due process challenge to Count Three is charitably viewed as predicated on the purported *inconsistency*—not insufficiency—of the Government's evidence, it still fails as premature. In order to determine whether the theory of the Weiss murder that the Government will advance at trial is inconsistent with the theory it has asserted in prior prosecutions, the Court would necessarily have to inquire into what facts will be adduced at trial. But "it is premature at this stage in the proceedings to deter-

mine what the facts will be at trial." *See United States v. Woodbine,* No. 02 Cr. 150, 2003 WL 1212972, at *3 (S.D.N.Y. Mar. 17, 2003).

Tellingly, Watts fails to cite a single case estopping the government *before trial*—or holding that the government should have been so estopped—from pursuing a theory on the ground that it would be factually inconsistent with the government's position in a prior prosecution. Watts cites *Gotti,* 457 F.Supp.2d 411, which did indeed "estop[ ]" the government before trial, but in a different context: pursuant to a prior plea agreement, the government had accepted a cash payment from the defendant instead of forcing him to forfeit certain properties; Judge Scheindlin held that "the Government is now estopped from claiming that [defendant] is laundering money by exploiting the very [properties] that it [had] ... exchange[d] for a cash payment." *Id.* at 427–28. Thus, the "estoppel" in *Gotti,* which essentially precluded the government from breaching a plea agreement, is not the sort of estoppel Watts seeks here.

In addition, the line of court of appeals cases on which Watts relies—cases finding that the government's use of factually irreconcilable theories violates due process—supports the conclusion that Watts' argument is premature. Those cases were decided on *post*-trial challenges to convictions—that is, *after* the government had presented its evidence, at a time when the court could properly evaluate whether that evidence could not be reconciled with the government's position in a prior prosecution. *See, e.g., Stumpf v. Mitchell,* 367 F.3d 594, 595 (6th Cir.2004), *vacated on other grounds, Bradshaw v. Stumpf,* 545 U.S. 175, 186–88, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005); *Smith v. Groose,* 205 F.3d 1045, 1046 (8th Cir.2000); *Thompson v. Calderon,* 120 F.3d 1045, 1047 (9th Cir.

1997), *vacated on other grounds,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). By contrast, it seems that circuit courts considering whether the government's use of inconsistent prosecutorial theories is barred by *judicial estoppel*—a doctrine typically invoked *ex ante* to preemptively bar a party from adopting a certain position—are inclined to conclude that the doctrine cannot be applied against the government in a criminal case. *See, e.g., United States v. Grap,* 368 F.3d 824, 830 (8th Cir.2004); *Nichols v. Scott,* 69 F.3d 1255, 1272 (5th Cir.1995); *United States v. Kattar,* 840 F.2d 118, 129 n. 7 (1st Cir.1988).

*Smith v. Groose,* the case on which Watts relies most heavily, and the Eighth Circuit's subsequent decision in *United States v. Grap,* are instructive. In *Smith,* the Eighth Circuit granted appellant's habeas petition, and vacated his conviction, because the state had used factually irreconcilable theories to secure his and another defendant's convictions in successive prosecutions for the same double murder. *See* 205 F.3d at 1052–53. Contrary to the Government's supposition here (*see* Gov't First Opp. at 39 n. 20), the Eighth Circuit's decision rested on due process grounds, not the doctrine of judicial estoppel—indeed, the panel distinguished the Fifth Circuit's decision in *Nichols* as having "discussed the problem of seemingly inconsistent prosecutorial arguments for different defendants at different trials, *but in the context of estoppel.*" *Id.* at 1050 (emphasis added).

Four years later, in *Grap,* the Eighth Circuit considered the defendant's appeal from the denial of his *pretrial* motion to dismiss the indictment; he invoked *judicial estoppel,* arguing that the government "should have been estopped" from prosecuting him for witness tampering because it had taken a position "flatly inconsistent"

with that charge during his prior sentencing for a different crime. 368 F.3d at 830–31. In rejecting defendant's argument, the court suggested that the doctrine of judicial estoppel may not be applied against the government in a criminal case. *See id.* ("[Defendant] has not identified any criminal case in which we have enforced an estoppel against the government."). The *Grap* court apparently did not think it necessary even to mention its prior decision in *Smith. Cf. United States v. Morse,* 613 F.3d 787, 791–93 (8th Cir. 2010) (considering (and rejecting) two challenges to government's use of inconsistent theories, one based on judicial estoppel, the other on due process).

The due process/judicial estoppel distinction suggested by *Smith, Grap* and the other court of appeals decisions cited above is far from tidy. In some of the decisions addressing whether the government is precluded from asserting inconsistent theories at different criminal trials, language invoking both due process and judicial estoppel makes it difficult to pinpoint the source of the potential preclusion. *See, e.g., Urso,* 369 F.Supp.2d at 263–65 (framing the question as whether "judicial estoppel may be applied to *prevent* a due process violation" (emphasis added)).

The important observation, however, is this: while some federal courts have been receptive to post-trial challenges to the government's use of factually inconsistent theories, it is not clear that *any* federal court has estopped the government in a criminal case *before trial* from advancing a theory on the ground that it would contradict the government's position in a prior prosecution. To be clear, the Court expresses no opinion on the background questions of whether the doctrine of judicial estoppel may be invoked against the government in a criminal case, or whether the use of inherently inconsistent prosecutorial theories violates due process. Instead, this observation, and the case law on which it is based, merely reinforce the Court's conclusion here—that even assuming the answer to both questions is yes, Watts' due process/estoppel-based attack on Count Three is premature, as its merit cannot be conclusively determined without knowing what facts the Government will assert at trial.

### C. Watts Has Failed to Demonstrate Sufficient Inconsistency in the Government's Positions

■ However, if the Court were to consider Watts' due process/estoppel argument on the merits, it fails (at least at this stage) because he has not demonstrated sufficient inconsistency in the Government's positions. If one thing is clear from the cases finding that the use of inconsistent prosecutorial theories violates due process, it is that the government's theories must be "inherently factually contradictory," *Smith,* 205 F.3d at 1052, such that they are "irreconcilable," *Stumpf,* 367 F.3d at 611.

Here, the Government does not dispute that "the people who ultimately shot Weiss were in the DeCavalcante Crime Family." (Gov't First Opp. at 41.) The Government contends that its position has "always" been that Gambino Family Boss John Gotti ordered Weiss' murder, and that many members of the DeCavalcante *and* Gambino Families participated in the plot. (*Id.* at 38.) The SDNY USAO has charged and convicted numerous members and associates of *both* families in connection with their roles in the Weiss murder plot. (*See id.* at 37.)

Watts does little to rebut the Government's explanation. He mainly points to the fact that the Government has taken the position in prior prosecutions that it

was the DeCavalcantes, not the Gambinos, who actually carried out the "hit" on Weiss. (*See* Watts' First Mem. at 26.) Although Watts may have identified an arguable tension between asserting that Watts aided and abetted the Weiss murder and the Government's position in prior prosecutions, he certainly has not demonstrated that the Government's theories of the Weiss murder are "categorically inconsistent," *Urso*, 369 F.Supp.2d at 264, or "irreconcilable," *Stumpf*, 367 F.3d at 611.

Accordingly, for the reasons discussed in this and the preceding subsection, Watts' motion to estop the Government from prosecuting him for the Weiss murder is denied.

## VI. Watts' Motion to Suppress the Fruits of the American Blast Search

 Watts moves to suppress the evidence obtained in a search of the Manhattan office of American Blast, Ltd. pursuant to a warrant (the "Warrant") issued by Magistrate Judge Gabriel Gorenstein. American Blast is the energy drink company that Watts allegedly used to launder proceeds of the Gambino Family's criminal operations. Watts challenges the search on three grounds: he argues that (1) the Warrant was overbroad because its scope exceeded the probable cause established in the warrant application; (2) the Warrant was insufficiently particularized; and (3) the procedure outlined in the warrant application for seizing and searching American Blast's computers was constitutionally inadequate. For the reasons discussed below, Watts' arguments fail, and the motion to suppress is denied.[7]

### A. Background

#### 1. The Warrant Application

On March 6, 2009, FBI Special Agent Beth LaManna ("Agent LaManna") applied via written affidavit (the "Affidavit") for a warrant to search the office of American Blast, located at 115 East 57th Street, New York, N.Y. (the "Premises"). As noted in the Affidavit, Agent LaManna had been a Special Agent with the FBI for thirteen years, was assigned to the Gambino Family organized crime squad, and had been involved in numerous investigations "relating to fraud, money laundering and extortion by members and associates of LCN." (Kramer Aff'n Ex. B (Aff. in Supp. of App. for Search Warrant, Mar. 6, 2009 ("LaManna Aff.")), ¶ 1.) After describing the layout of the office space (based on information from an employee in the building), the Affidavit stated the facts supporting Agent LaManna's assertion that the FBI's investigation had yielded probable cause to believe that the Premises contained evidence of money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

The Affidavit set forth certain pertinent background facts regarding Watts' alleged involvement in the Gambino Family. LaManna had gathered those facts from three former Gambino Family members cooperating with the government, who all described Watts as a "long-time, powerful Gambino associate." (LaManna Aff. ¶ 6.) LaManna learned from the cooperators, whose information was independently corroborated, that before his incarceration in

---

7. Watts does not seek an evidentiary hearing to resolve any factual disputes related to the suppression issue, and the uncontested facts in the parties' papers regarding the Warrant and supporting affidavit permit the Court to resolve the motion without a hearing. *See*

*United States v. Watson*, 404 F.3d 163, 167 (2d Cir.2005); *United States v. Hernandez*, No. 09 CR 625, 2010 U.S. Dist. LEXIS 719, at *23–24, 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010).

1995, Watts made tens of millions of dollars through various illegal activities, including a fraudulent scheme involving the sale of prepaid phone cards. (*Id.* ¶¶ 6–7.)

The LaManna Affidavit stated that in 2007, after his release from prison, Watts and others created American Blast in part to launder Gambino Family proceeds and to make money through fraudulent means. (*Id.* ¶ 5.) The Affidavit asserts that Watts did not disclose his involvement in American Blast, or even its existence, to his probation officer while he was on supervised release; and, when he was most recently arrested in February 2009, he claimed to be "retired." (*Id.*) The supporting Affidavit further states that one of Watts' main partners in the American Blast venture is Vincent Russo ("Russo"), "a long-time associate of both the Columbo and Gambino LCN Families." (*Id.*) According to LaManna's sources at companies that dealt with American Blast, it was managed and operated primarily by Watts, who used the alias "Joseph Russo," along with his partner Vincent Russo. (*Id.* ¶ 9.)

During the investigation, LaManna reviewed the records for various bank accounts connected to American Blast. The Affidavit states that between June 2007 and January 2009, more than $2 million were deposited in an American Blast account at JPMorgan Chase, and that a significant portion of the $2 million originated with one Anthony DeLorenzo, a/k/a "Tony Florida," Watts' long-time Gambino associate and one of the "straw buyers" involved in laundering Watts' loansharking proceeds in Florida in the 1990s. (*Id.* ¶ 11(a).) The Affidavit also indicates that other American Blast funds and accounts are connected to known Gambino Family associates. (*See id.*) In addition, LaManna spoke on several occasions with two unnamed principals at a company called Bio–Botanica, and the Affidavit states that, ac-

cording to those two executives, Vincent Russo said that the source of American Blast's funding was money that he and "Joseph Russo" had made in the "phone card business." (*Id.* ¶ 11(b).)

The Affidavit further described a specific transaction between American Blast and Bio–Botanica. According to the two Bio–Botanica executives, in 2008, Watts and Russo ordered a shipment of energy shots but never paid the full balance and still owe Bio–Botanica $45,000. (*Id.* ¶ 11(c).) When one of the executives sent an email to American Blast requesting that it pay the balance, Watts left him a threatening voicemail (using the name "Joseph"), stating, before abruptly hanging up, "Who do you think you're dealing with here? Children?" (*Id.*) The two executives told LaManna that they did not know "Joseph Russo" was, in fact, the "reputed Gambino associate Joseph Watts," and asserted that they would not have done business with American Blast if they had. (*Id.* ¶ 11(b).)

The Affidavit stated that it "appears that the American Blast office is still operational," and that "even illegitimate businesses—such as those used in fraud or money laundering schemes—often have records of [their] activity" at their place of operations. (*Id.* ¶¶ 12–13.) Further, the Affidavit asserted that American Blast apparently "does conduct some business and would have records relating to that business," and that, moreover, "even the limited number of records or lack of particular type of records may be of evidentiary value in establishing that one of the purposes of American Blast was to launder money." (*Id.* ¶ 13.)

Finally, Agent LaManna averred that she knew from her experience that illegitimate businesses often keep records in paper and electronic form, and that many relevant documents (e.g., emails) may exist only in electronic form. (*Id.* ¶ 14.) Ac-

cordingly, the Affidavit set forth a protocol that agents would follow when searching American Blast's computers. (*Id.* ¶¶ 14–18.) After identifying various concerns and difficulties associated with computer searches, the protocol stated that agents would seize the computers and transport them to a law enforcement laboratory, where they would be "reviewed by appropriately trained personnel," using any or all of several different specified techniques, "in order to extract and seize any data that falls within the list of items to be seized set forth [in the Affidavit]." (*Id.*)

## 2. The Warrant

Based on the foregoing, Agent LaManna applied for a warrant to search American Blast's office for the records and items listed in "Attachment A" to the Affidavit. Attachment A, which was also attached to the Warrant, authorizes the search of a broad range of paper and electronic documents and items, including:

1. All documents relating to American Blast, Ltd., including but not limited to: bank records, accounting records, financial documents, sales records, records relating to owners, creditors and investors, employees, records relating to product distributors and customers, records relating to suppliers, records relating to sales and marketing, and records relating to communications.

2. All documents relating to Joseph Watts, Joseph Russo, Vincent Russo, Anthony DeLorenzo, . . . and/or individuals associated with or employed by American Blast, Ltd.

3. All documents indicating where criminal proceeds are held, including, but not limited to, safes, bank account information, safe deposit box keys. . . .

4. All records relating to communications, including but not limited to

telephones, pagers, cellular telephones. . . .

5. Computers, computer storage . . . and files, data and information contained thereon, together with computer hardware, peripherals and documentation used to access the above.

(LaManna Aff. Attachment A.)

Magistrate Gorenstein approved the application and issued the warrant on March 9, 2009. (Kramer Aff'n Ex. D (Search Warrant).) The Warrant was executed that same day. Law enforcement personnel seized various papers, computer hard drives and other items from American Blast's office.

## B. The American Blast Search Warrant Was Valid

### 1. Probable Cause

■■■ The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause is a "flexible, common-sense standard," *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), which requires a case-by-case analysis of the totality of the circumstances, *see Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). As the Supreme Court stated in *Gates:*

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence

of a crime will be found in a particular place.

*Id.* at 238, 103 S.Ct. 2317; *accord United States v. Smith,* 9 F.3d 1007, 1012 (2d Cir.1993).

 A court's review of the sufficiency of an affidavit supporting a search warrant that was issued by a magistrate is not de novo. *Smith,* 9 F.3d at 1012. Instead, "A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates,* 462 U.S. at 236, 103 S.Ct. 2317 (internal quotations and citation omitted). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed." *Smith,* 9 F.3d at 1012 (*quoting Gates,* 462 U.S. at 238–39, 103 S.Ct. 2317); *see, e.g., United States v. Sugar,* 606 F.Supp. 1134, 1149 (S.D.N.Y.1985).

 Further, "A reviewing court should not interpret supporting affidavits in 'a hypertechnical, rather than a commonsense manner.'" *United States v. Dinero Express, Inc.,* No. 99 Cr. 975, 2000 WL 254012, at *6, 2000 U.S. Dist. LEXIS 2439, at *17 (S.D.N.Y. Mar. 6, 2000) (*quoting Smith,* 9 F.3d at 1012). "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Smith,* 9 F.3d at 1012 (*quoting United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

Here, Watts does not dispute that "[c]learly ... there was probable cause to conduct some form of search of the [American Blast] office." (Watts' Second Reply at 14 (internal quotations and citation

omitted).) Instead, he argues that the La-Manna Affidavit did not establish probable cause for a search as broad as the one authorized by Magistrate Gorenstein.[8]

Although this argument implicates probable cause, it ultimately constitutes a challenge to the Warrant's particularity. The challenge will succeed or fail depending on whether the "all-records" exception to the Fourth Amendment's particularity requirement applies, since that exception allows the broad search of all records of a business if there is probable cause to believe the business is permeated by criminal activity. *See Nat'l City Trading Corp. v. United States,* 635 F.2d 1020, 1026–27 (2d Cir.1980). The Court thus addresses Watts' first challenge to the American Blast Warrant in the ensuing section, mindful of the standard for evaluating the sufficiency of an affidavit set forth above.

### 2. Particularity

 The Fourth Amendment's particularity requirement "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *United States v. Riley,* 906 F.2d 841, 844 (2d Cir.1990); *accord United States v. Buck,* 813 F.2d 588, 590 (2d Cir. 1987) (describing "[t]he purpose of the particularity requirement" as preventing the "'specific evil [of] the 'general warrant' abhorred by the colonists'" that allowed "'exploratory rummaging in a person's belongings'") (*quoting Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). However, "the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls

---

**8.** The Government does not dispute that Watts exercised significant control over the Premises, and has standing to challenge the search. (*See* Gov't Second Opp. at 14 n. 1.)

within the described category." *See Riley*, 906 F.2d at 844.

■■■ A warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992); *see United States v. Regan*, 706 F.Supp. 1102, 1110 (S.D.N.Y.1989) (holding that a search warrant must be sufficiently specific so as to provide "the reasonable guidance necessary for the exercise of rational judgment" by the executing officers "in selecting what items to seize" (internal quotations and citation omitted)). The Fourth Amendment "does not require that every item or document to be seized be specifically identified within the warrant. Indeed, generic terms can properly be used to describe the material to be seized." *United States v. Dinero Express, Inc.*, No. 99 Cr. 975, 2000 WL 254012, at *8, 2000 U.S. Dist. LEXIS 2439, at *22 (S.D.N.Y. Mar. 6, 2000) (internal citation omitted).

■■■ Nor does "[t]he fact that the warrant called for seizure of a broad array of items ... prove that the warrant fails to meet this requirement of particularity." *United States v. Sugar*, 606 F.Supp. 1134, 1151 (S.D.N.Y.1985); *see Dinero Express*, 2000 WL 254012, at *8, 2000 U.S. Dist. LEXIS 2439, at *22 ("[T]he validity of a warrant is not affected by the fact that a vast amount of material falls within its scope.") Furthermore, "Courts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances." *See Buck*, 813 F.2d at 590 (internal quotations and citation omitted).

Here, the Government essentially concedes that the Warrant, which broadly authorized the seizure of "virtually all business records in American Blast's offices"

(Gov't Second Opp. at 19), fails by standard measures of particularity. The Government argues, however, that the warrant is valid because it falls within the all-records exception to the particularity requirement. The Court agrees.

### a. The All–Records Exception

■■■ When there is probable cause to believe that an entire business is "pervaded" or "permeated" with fraud, seizure of all records of the business is appropriate, and broad language used in a search warrant will not offend the particularity requirement. *See U.S. Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir. 1989): *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1024–25 (2d Cir. 1980): *see also United States v. Smith*, No. 05–CR–293A, 2007 WL 2088938, at *3, 2007 U.S. Dist. LEXIS 52377, at *8 (W.D.N.Y. July 19, 2007) ("Although the particularity requirement of the Fourth Amendment creates a general presumption against 'general' or 'all-records' warrants, courts, including the Second Circuit, have recognized an exception where there is probable cause to believe that criminal activity permeates the business to be searched."). This is known as the " 'all-records' exception" to the particularly requirement, *United States v. Burke*, 718 F.Supp. 1130, 1139 (S.D.N.Y.1989), although "[t]he principle is not so much an 'exception' to the particularity requirement ... as a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based," *United States v. Bowen*, 689 F.Supp.2d 675, 683 n. 6 (S.D.N.Y.2010) (internal quotations and citation omitted).

■■■ In order to trigger the all-records exception, "it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrat-

ing that every part of the enterprise in question is engaged in fraud." *Burke,* 718 F.Supp. at 1139. "Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'" *Id.* (*quoting United States v. Offices Known as 50 State Distributing Co.,* 708 F.2d 1371, 1375 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984)).

### b. The Warrant Falls Within the All–Records Exception

The all-records exception applies in this case. The LaManna Affidavit provided Magistrate Gorenstein with a substantial basis for concluding that there was probable cause to believe that criminal activity permeated American Blast, and that a broad, all-records search of its office was therefore appropriate.

As described above, the Affidavit set forth facts supporting the conclusion that Watts, a powerful Gambino Family associate, was hiding a new criminal venture from his probation officer; that Watts' principal partner, Vincent Russo, was another Gambino Family associate who had teamed with Watts in the 1990s to make millions through a phone card scam; that Watts was operating the business through a false name; that a primary source of American Blast's funds was Anthony De-Lorenzo, who had helped Watts launder Gambino Family proceeds in Florida; and that when money was transferred into American Blast, some of it was then sent to the son of a Gambino Family capo. On top of all this, the Affidavit asserted that one of American Blast's business partners had been induced to give American Blast product on credit, that American Blast had refused to pay the $45,000 it owed, and that Watts had left a threatening voicemail

on a Bio–Botanica executive's answering machine.

Contrary to Watts' suggestion, the La-Manna Affidavit alleged considerably more than "only a single arguably fraudulent transaction" with Bio–Botanica (*see* Watts Second Mem. at 8–10). In fact, the Bio–Botanica transaction, while certainly consistent with the inference that American Blast is a fraudulent operation, is far from the most persuasive piece of evidence in the Affidavit. It is therefore not surprising that Watts harps on it in his brief, as though the Affidavit alleged nothing else. But the Affidavit, taken as a whole, supports the reasonable conclusion that American Blast was permeated with criminal activity.

Watts also makes much of the Government's acknowledgment that American Blast engaged in some "legitimate activity" (Gov't Second Opp. at 20–21)—for example, selling, or at least trying to sell, an energy drink. But even if American Blast engaged in *some* legitimate activity, that does not defeat the all-records exception. In order to trigger the exception, the Affidavit was not required to set forth evidence demonstrating that every part of American Blast was engaged in criminal activity. *See United States v. Burke,* 718 F.Supp. 1130, 1139 (S.D.N.Y.1989). The standard is whether the Affidavit established probable cause to believe that the company was *permeated* or *pervaded* with criminal activity—and, as explained above, it did.

The Affidavit's money laundering allegations, in particular, supported a broad seizure of all records, including those relating to "legitimate" activity. Because there was probable cause to believe that Watts was using American Blast to launder Gambino Family proceeds, an all-records search was appropriate to enable the government to examine a complete picture of

the funds flowing into and out of the company. Analogously, in *United States v. Dinero Express, Inc.*, No. 99 Cr. 975, 2000 WL 254012, 2000 U.S. Dist. LEXIS 2439 (S.D.N.Y. Mar. 6, 2000), the court upheld the seizure of all records of the defendant money remitter's transactions—both illegal *and* legal—because there was probable cause to believe that the defendant was using lawful remittances to obscure its money laundering activities and that, if "the lawful remittances lend a cover of legitimacy to the tainted remittances, they are also evidence of the criminal money laundering." *See id.* at *9, 2000 U.S. Dist. LEXIS 2439 at *24–27; *see also, e.g., United States v. Wapnick*, No. CR–92–419, 1993 WL 86480, at *6 (E.D.N.Y. Mar. 16, 1993) (upholding broad seizure because "in order to reconstruct defendants' true financial and tax picture, evidence regarding legal as well as illegal transactions may be necessary," and "a warrant cannot be so narrow that it requires executing agents to conduct a lengthy, on-site examination of the documents in order to separate evidence of legal transactions from evidence of illegal transactions" (internal quotations and citation omitted)).

■■■ Furthermore, "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985); *see, e.g., Dinero Express*, 2000 WL 254012, at *7, 2000 U.S. Dist. LEXIS 2439, at *20–21; *Burke*, 718 F.Supp. at 1132–33. Here, Agent LaManna had been a Special Agent with the FBI for thirteen years, was a member of the Gambino Family organized crime squad, and had been involved in numerous investigations of Mafia-related fraud, money laundering and extortion. Her conclusion that Watts, Russo and others created and used American Blast to launder criminal proceeds and generate income through fraud is an important factor weighing in favor of finding that there was probable cause for a broad, all-records search.

In arguing that Agent LaManna's Affidavit fell short of establishing probable cause for an all-records search, Watts cites several district court cases finding the all-records exception inapplicable, but all are distinguishable from the case at bar. *United States v. Vilar*, No. S3 05–CR–621, 2007 WL 1075041, 2007 U.S. Dist. LEXIS 26993 (S.D.N.Y. Apr. 5, 2007), the case on which Watts relies most heavily, is inapposite because a distinct and significant portion of the business whose office was to be searched was not a target of the investigation. The two defendants, principals of an investment management company, were accused of misusing $25 million in connection with three specific investment vehicles, but the company as a whole managed roughly $1.2 *billion* in assets. *Id.* at *20–21, 2007 U.S. Dist. LEXIS 26993 at *62–63. Thus, while "there was probable cause to conduct some form of search of the [company's] offices," the all-records search authorized by the warrant was unreasonable. *See id.* at *20, 2007 U.S. Dist. LEXIS 26993 at *59. Here, by contrast, the warrant application's allegations of money laundering and fraud are not cabined to discrete and severable segments of American Blast's operations.

Watts also points to *United States v. Hickey*, 16 F.Supp.2d 223 (E.D.N.Y.1998), but that case, too, is different in important ways from this one. *Hickey* involved four corporations allegedly involved in "the Islip fraud"—a RICO and money laundering scheme to control and exploit the garbage business in Islip, New York. *See id.* at 226. The challenged search warrants authorized the seizure of all business records relating to those entities. *Id.* at 237. However, one of the entities "had significant operations outside of the Town of Islip both

before and during the Islip fraud," and another "engaged in other activities beyond serving as a 'front' for the [criminal] organization." *Id.* at 241. For those reasons, among others, Judge Hurley held that the all-records exception did not save the challenged warrants. *Id.* at 240–41.

The facts in this case do not counsel against application of the all-records exception, as they did in *Hickey. Cf. id.* at 243 (noting that "the 'all records' exception, and considerations of specificity, are 'fact specific,'" making each case "quasi-*sui generis*"). Indeed, *Hickey* actually supports this Court's reasoning that the LaManna Affidavit's evidence of money laundering weighed in favor of a broad, all-records search: the *Hickey* court acknowledged that, "Money laundering is intended to defy detection and may take many forms. *Often a broad-based warrant is required by the very nature of the crime,*" *id.* at 242 (emphasis added). In *Hickey,* however, "The money laundering scheme was narrow," and was known to consist simply of a "series of money transfers among the four corporate defendants," such that "the scope of the warrants may not be justified based on the fact that the Indictment includes charges of money laundering." *Id.* at 242–43. The same cannot be said here.

Thus, for the reasons discussed above, the Court concludes that the Warrant falls within the all-records exception to the Fourth Amendment's particularity requirement. A practical, common-sense assessment of the facts stated in the LaManna Affidavit supports the conclusion that there was probable cause to believe that criminal activity permeated American Blast.

### c. Watts' Second Challenge to the Warrant's Specificity Fails

In his second challenge to the specificity of the American Blast Warrant, Watts argues that, "even assuming probable cause for an all-records search," the Warrant was insufficiently particular because "it failed to indicate the crimes under investigation[ ] and included general, catch-all paragraphs authorizing seizure of a virtually unlimited body of documents," such that "the executing agents were endowed with untamed discretion." (Watts' Second Mem. at 11 (internal quotations and citations omitted).) Having found that the all-records exception applies, this argument is easily rejected. Precisely *because* the Warrant authorized law enforcement agents to seize virtually all business records in American Blast's offices, it did not require them to exercise excessive discretion in determining what documents fell within its scope.

As Watts' argument implies, "warrants will frequently lack particularity where they include a general, catch-all paragraph or provision, often one authorizing the seizure of 'any or all records' of a particular type." *United States v. Vilar,* No. S3 05–CR–621, 2007 WL 1075041, at *22, 2007 U.S. Dist. LEXIS 26993, at *67 (S.D.N.Y. Apr. 5, 2007) (collecting cases). Here, the language of the Warrant is undeniably broad, authorizing, for example, the seizure of "[a]ll documents relating to American Blast." (Search Warrant at Attachment A.) However, as established in the preceding subsection, the breadth of the language in the Warrant passes constitutional muster because the all-records exception to the particularity requirement applies. Moreover, Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize. In short, the American Blast Warrant left the executing officers with little discretion. *Cf. United States v. Offices Known As 50*

*State Distributing Co.,* 708 F.2d 1371, 1372–75 (9th Cir.1983) (finding that "[t]he warrant left executing officers with no discretion," and thus met the particularity requirement, because it "essentially authorized seizure of *all* the business-related books, records, equipment and merchandise on [defendant's] premises"), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984).

Watts also takes issue with the Warrant's specificity because it "failed to indicate the crimes under investigation." (Watts' Second Mem. at 11.)[9] Warrants are often deemed insufficiently particular where "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken." *See United States v. George,* 975 F.2d 72, 76 (2d Cir.1992). However, there is no constitutional *requirement* that a warrant must specify the crime for which a search is being conducted. Rather, specifying the crime is important when it helps guard against general searches by delineating the scope of the search and allowing executing officers to determine what they are authorized to seize. That is not the case here.

The Second Circuit's decision in *George,* a case relied upon by Watts for the proposition that a search warrant's failure to specify the alleged crime renders it insufficiently particular, illustrates the distinction. In *George,* police secured a warrant to search the apartment of suspects in the armed robbery of a McDonald's. *Id.* at 74. The warrant identified several specific items connected to the robbery—for example, a burgundy purse, the keys to a Honda motorcycle, a McDonald's uniform, and

a handgun—but it also authorized the seizure of *"any other evidence relating to the commission of a crime." Id.* The Second Circuit found the warrant invalid because its reference to evidence of "a crime" did not "provide ... readily ascertainable guidelines for the executing officers as to what items to seize." *See id.* at 76; *see also, e.g., Vilar,* 2007 WL 1075041, at *22, 2007 U.S. Dist. LEXIS 26993, at *67–68 (finding warrant deficient because all-records exception did not apply and warrant failed to identify the alleged wrongdoing triggering the search); *United States v. Hickey,* 16 F.Supp.2d 223, 239 (E.D.N.Y. 1998) (same).

Here, on the other hand, the American Blast Warrant properly authorized the seizure of all records relating to the company. Indicating in the Warrant that the company was suspected of money laundering and mail and wire fraud was not necessary to delineate the scope of the search or confine the discretion of the executing officers. The Court therefore rejects the notion that the Warrant offended the Fourth Amendment's particularity requirement because it did not specify the crimes under investigation. Watts' second challenge to the American Blast Warrant therefore fails.

### 3. The Search of American Blast's Computers

Watts' third attack on the American Blast search concerns the digital search protocol outlined in the warrant application. Watts contends that the seizure and search of American Blast's computers was constitutionally offensive because the search protocol set forth in the LaManna Affidavit did not comply with that prescribed by the Ninth Circuit in *United*

---

**9.** The supporting Affidavit *did* specify the conduct and crimes (money laundering and mail and wire fraud) triggering the search, but Watts is correct that the Affidavit may not be considered in this regard because it was not attached to or incorporated by reference in the Warrant itself. *See Groh v. Ramirez,* 540 U.S. 551, 557–58, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004).

*States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989 (9th Cir. 2009) (en banc) ("*CDT*"), including, for example, requiring the government to waive reliance on the plain view doctrine and shield case agents from data not within the scope of the warrant. While certain aspects of the *CDT* protocol seem sensible, *CDT* has not been adopted as the law of this Circuit, and the Court declines to follow it here.

As numerous courts and commentators have noted, searches of computers raise unique Fourth Amendment concerns. *See, e.g., CDT*, 579 F.3d 989; *United States v. Vilar*, No. S3 05–CR–621, 2007 WL 1075041, at *34–38, 2007 U.S. Dist. LEXIS 26993, at *111–26 (S.D.N.Y. Apr. 5, 2007); Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531 (2005). Relevant electronic documents are often "intermingled" with thousands of other files that the government does not have probable cause to search. *See Vilar*, 2007 WL 1075041, at *35, 2007 U.S. Dist. LEXIS 26993, at *112; *see also CDT*, 579 F.3d at 1004. By necessity, locating sought-after data requires examining "a great many other files" to exclude the possibility that the data is concealed there. *CDT*, 579 F.3d at 1004 ("There is no way to be sure exactly what an electronic file contains without somehow examining its contents. . . .").

Another potential complication is that often, because of time restraints and technical limitations, a computer search cannot be carried out when the warrant is executed at the target premises. *See United States v. Hill*, 459 F.3d 966, 974–75 (9th Cir.2006). Instead, it is frequently the case—as it was here—that "the normal sequence of search and then selective seizure is turned on its head," as the government seizes computer hardware from the premises and then searches it at a later time. *Vilar*, 2007 WL 1075041, at *35,

2007 U.S. Dist. LEXIS 26993, at *113 (internal quotations and citation omitted). This sort of "seizure and search" poses the risk that "law enforcement officers, unencumbered by the type of time pressures attendant to doing a search of a physical premises, might be tempted to rummage through a computer's files well beyond the scope of a warrant." *See id.* at *35, 2007 U.S. Dist. LEXIS 26993 at *114.

On the other hand, it is precisely *because* computer files can be intermingled and encrypted that the computer has become "the modern criminal's best friend." *See id.* at *36, 2007 U.S. Dist. LEXIS 26993 at *115. Because computers are such "useful criminal tool[s]," *id.*, the government is often able to persuasively demonstrate the "pressing need of law enforcement for broad authorization to examine electronic records," *see CDT*, 579 F.3d at 1004.

In *CDT*, the Ninth Circuit, sitting en banc, considered these and other concerns and complications associated with computer searches, and established a set of "procedures and safeguards" that, in the court's judgment, "strike a fair balance" between the needs of law enforcement and the protections of the Fourth Amendment. *See id.* at 993, 1006. The Ninth Circuit held that:

1. Magistrates should insist that the government waive reliance upon the plain view doctrine in digital evidence cases.

2. Segregation and redaction must be either done by specialized personnel or an independent third party. If the segregation is to be done by government computer personnel, it must agree in the warrant application that the computer personnel will not disclose to the investi-

gators any information other than that which is the target of the warrant.

3. Warrants and subpoenas must disclose the actual risks of destruction of information as well as prior efforts to seize that information in other judicial fora.

4. The government's search protocol must be designed to uncover only the information for which it has probable cause, and only that information may be examined by the case agents.

5. The government must destroy or, if the recipient may lawfully possess it, return non-responsive data, keeping the issuing magistrate informed about when it has done so and what it has kept.

*Id.* (citations omitted).

The Second Circuit has yet to address in a comprehensive opinion like *CDT* the unique Fourth Amendment issues raised by computer searches. To date, it does not appear that any district court decision in this Circuit has embraced *CDT*. Watts suggests otherwise, pointing to *Vilar*, *United States v. Cioffi*, 668 F.Supp.2d 385 (E.D.N.Y. 2009), and *United States v. Graziano*, 558 F.Supp.2d 304 (E.D.N.Y. 2008), which he describes as "all endorsing roughly comparable precautions [as *CDT*]." (*See* Watts' Second Reply at 14–15.) That is not accurate.

In *Vilar*, Judge Karas held that the methodology outlined in the warrant application—which, contrary to the strictures of *CDT*, permitted case agents to search for electronically stored materials "related to the subject matter of the investigation"—was neither "perfect" nor "exhaustive," but "at least provided some information to the magistrate judge about the types of methods the Government contemplated using," and, "[t]hus, ... is far more than the Constitution required." 2007 WL 1075041,

at *38, 2007 U.S. Dist. LEXIS 26993, at *126. In *Cioffi*, Judge Block characterized *CDT* as representing the Ninth Circuit's approach to "balanc[ing] privacy interests and legitimate law-enforcement concerns in the context of computer searches," but did not express an opinion about whether such an approach was constitutionally required; instead, he found the challenged warrant invalid on the ground that it was overbroad. *See* 668 F.Supp.2d at 392. And, in *Graziano*, Judge Bianco, without citing *CDT*, upheld a warrant simply because it established probable cause to search the defendant's computers and adequately specified the evidence being sought. *See* 558 F.Supp.2d at 316. Thus, none of the three cases can be said to have adopted the *CDT* standards.

While the Second Circuit has not yet opined on precisely how the Fourth Amendment's particularity requirement applies to computer searches, certain guiding principles have emerged in this and other circuits. Most importantly, "whatever new challenges computer searches pose in terms of particularity," *Cioffi*, 668 F.Supp.2d at 392, "the ultimate Fourth Amendment standard is the same for both computer and hard-copy searches: *reasonableness*," *Vilar*, 2007 WL 1075041, at *36, 2007 U.S. Dist. LEXIS 26993, at *116–17 (emphasis added). The Fourth Amendment affords "neither a heightened nor a reduced level of protection for information stored on computers." *Id.*

The Court need not delve any deeper into exactly what the Fourth Amendment requires in the context of computer searches. In this case, the digital search protocol outlined in the warrant application was not constitutionally inadequate. It may not have been perfect, but it passes constitutional muster. It appropriately

authorized the seizure of American Blast's computers so that they could be searched for the types of business records and other documents identified in Attachment A; it also provided Magistrate Gorenstein with at least some information regarding the search techniques that the Government contemplated using. Furthermore, because there was probable cause for an all-records search, many of the privacy concerns informing the Ninth Circuit's decision in *CDT* are far less prevalent here. Unlike *CDT*, this is not a case where the government reviewed an exceedingly large amount of electronic files when it was only authorized to seize a very narrow category of documents.

In sum, the Court concludes that the digital search protocol set forth in the LaManna Affidavit was not constitutionally deficient.[10] Thus, Watts' third and final challenge to the American Blast search fails, and his motion to suppress the fruits of that search is denied.

## VII. Disclosure of *Brady* and Other Material; Scheduling

Watts has requested, in the event the Weiss murder count survived his motions, "*Brady* production of all government witness statements—including trial testimony, 302s and rough notes—concerning the Weiss homicide." (Watts' First Mem. at 30.) The Government does not respond to this request in its papers.

The Court hereby reminds the Government of its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). As the Second Circuit has held, the government is obligated to disclose *Brady* material in sufficient time for the defense to make effective use of it at trial. *See United States v. Coppa*, 267 F.3d 132, 144 (2d Cir.2001).

Trial in this matter will begin on Monday, October 25, 2010. The final pretrial conference will take place on Friday, October 1, at 10:00 a.m.

With respect to all *Giglio* and 3500 material, the Government must provide this material to Defendant at least ten business days prior to trial. Earlier, of course, would be better.

The Government must provide Defendant with notice of any 404(b) evidence it intends to introduce at trial no later than September 16. Defendant will have one week to file written objections to the introduction of that evidence. *In limine* motions are subject to the same schedule. The Court will rule on the 404(b) evidence and all *in limine* motions at the final pretrial conference on October 1.

## CONCLUSION

For the reasons set forth above, the Court denies Defendant's pretrial motions to dismiss Counts One and Three of the Superseding Indictment. Defendant's mo-

---

**10.** The Court notes that Watts does *not* appear to challenge the search of American Blast's computers on the ground that the Warrant *itself did* not contain a digital search protocol, and with good reason—numerous courts in this and other circuits have held that a warrant "need not specify *how* the computers will be searched," *Vilar*, 2007 WL 1075041, at *37, 2007 U.S. Dist. LEXIS 26993, at *121–23 (collecting cases and stat-

ing that "[t]he majority view rejecting a protocol requirement makes good sense as there is no principle in the law that requires law enforcement officers to limit their investigative techniques *ex ante*, before conducting any kind of search"). Instead, Watts argues that the protocol described in the supporting Affidavit was inadequate; and, as explained above, that argument fails.

tion to suppress the fruits of the American Blast search is also denied.